634 So.2d 1309 (1994)
STATE of Louisiana
v.
William Rodney BROSSETTE.
No. Cr93-1036.
Court of Appeal of Louisiana, Third Circuit.
March 2, 1994.
*1312 Gerald Henderson, Kathrine Sara Williamson, for State.
George Lewis Higgins III, for William Rodney Brossette.
Before GUIDRY, LABORDE and THIBODEAUX, JJ.
GUIDRY, Judge.
Defendant, William Rodney Brossette, was charged by grand jury indictment with one count of aggravated rape, in violation of La. R.S. 14:42. During trial by jury, which began on October 16, 1992, Brossette moved for a mistrial based on alleged improper questioning of a defense expert by the prosecutor. The court denied this motion. After retiring to deliberate on October 23, 1992, the jury returned twice and informed the court that they were deadlocked. For this reason, the court declared a mistrial.
On March 9, 1993, defendant's second jury trial began. On the first day, defendant filed a motion to quash the indictment based on alleged prosecutorial misconduct in questioning the aforementioned defense expert during the first trial. Brossette argued that double jeopardy precluded a second trial. The court denied this motion. On March 12, 1993, defendant moved to exclude the testimony of Dr. Giles, a DNA screening expert, and the associated DNA evidence. The court overruled each motion. Defendant once again moved for a mistrial on March 16, 1993, because the court would not allow defense counsel to emphasize certain portions of publications entered into evidence. The court denied this motion.
On March 18, 1993, the jury returned a verdict of guilty of aggravated rape. Defendant gave an oral notice of appeal. Defendant then filed a motion for new trial, which was denied. The court thereafter sentenced defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant appeals his conviction, alleging the trial court erred as follows:
1. Failing to grant defendant's motion to quash by reason of evidence being introduced at the initial trial before the jury via the prosecutor's statements during cross-examination under the guise of impeachment and/or refreshment of memory which clearly should have mandated a mistrial with prejudice.
2. Failing to exclude and suppress the DNA testing results made from specimens *1313 taken from the crotch of underwear seized at the victim's home.
3. Denying a hearing on the pretrial motion to suppress DNA evidence, filed immediately prior to trial.
4. Denying defendant the opportunity to question the actual DNA laboratory personnel who performed testing.
5. Denying the defendant discovery of the Child Protection Agency records which were made discoverable during the initial trial.
6. Failing to allow the defendant to put on a defense through cross-examination and case-in-chief as to post-allegation investigation, conduct and relationship between the Child Protection Agency, law enforcement and the alleged victim and her family.
7. Excluding any cross-examination and/or evidence presented by the defense as to post-accusation conduct of the parties involved including but not limited to the court battle between mother and natural father and the tracking and bolstering of the alleged victim's testimony by Child Protection Agency personnel.
8. Prohibiting the alleged victim's mother from testifying about post-accusation conduct of the Child Protection Agency personnel and the police.
9. Failing to grant defendant's mistrial motion filed when the defense, which built much of its case on negative vaginal washings via discovery, learned that no classic washings were performed.
10. Failing to grant defendant's motion to quash the indictment because of improper questioning of the prosecutor in the initial trial which should have barred subsequent prosecution.
11. Prohibiting defense counsel from highlighting to the jury particular parts of a sexually instructive book which was allowed into evidence.
12. Excusing a selected and seated juror, Ms. Sanders, prior to deliberation, who sat through the entire trial, because of her knowledge of a defense character witness.
13. Failing to excuse a juror, Ms. Wolfe, who had several communications with the excused juror, Ms. Sanders, concerning a defense character witness' reputation.
14. Limiting the verbiage in impeachment of State's witnesses when contradictions were found with prior jury trial testimony.
15. Allowing Dawn Tingle, a serologist, to testify as an expert in the field of seminal transfer without a proper foundation for such expert testimony.
16. Granting an oral motion in limine to exclude certain testimony by the victim's mother as to her background.
17. Failing to either grant a mistrial or admonish the jury when the prosecutor inferred that the victim's sister (a defense witness) was changing her testimony from the previous trial.
18. Failing to give defendant's requested jury charges.
19. Failing to excuse certain jurors for cause.
20. Failing to grant defendant's motion for new trial, in that the law and evidence do not legally sustain a verdict of guilty to the crime of aggravated rape.
21. Review of any and all errors patent.
Assignments numbered 14, 16, 18 and 19 were expressly abandoned by defendant. Pursuant to Uniform RulesCourts of Appeal, Rule 2-12.4, these assignments will not be addressed. We affirm.

FACTS
Defendant, William Rodney Brossette, is a forty year old male who was found guilty of the aggravated rape of his ten year old stepdaughter, Ashley Michelle Knight.
Ashley was living in a trailer with her mother and stepfather, the defendant, along with her nine year old sister, Alyssa, and her stepsister, Heather. On September 5, 1991, Ashley became ill at school. Her mother brought her home. Mrs. Brossette cooked soup for Ashley and returned to work, leaving Ashley at home with the defendant. Ashley then went to her room to sleep. Ashley testified that the defendant walked into her room and instructed her to get off of the bunkbed and onto the floor. He then removed *1314 his shorts and her underwear. The defendant then placed a towel under her, raised her nightgown, and penetrated her while touching her breasts. Ashley testified that she screamed and told him to stop. Ashley stated that she saw "white milky stuff" coming out of the defendant's penis. The defendant told Ashley to clean herself up and to put some toilet tissue in her panties. Ashley did as she was told and went to sleep. After a short time, Ashley testified that the defendant woke her again and told her to go into her sister's room. The defendant followed her into the room, removed his jeans, and made Ashley remove her underwear. The defendant did not penetrate her on this occasion but did ejaculate. Soon thereafter, her grandmother, Gloria Allen, pulled into the driveway and honked her horn, whereupon the defendant put his jeans on and told Ashley to clean herself up. Gloria Allen testified at trial that she saw the defendant on the day in question wearing blue jeans and nothing more.
Ashley returned to school the next day and confided in her teacher, Mrs. Margaret Laborde, about the sexual attack by her stepfather. Mrs. Laborde testified that Ashley told her that "her stepfather came in her room, made her take off her clothes and he got on top of her". Ashley was taken to the hospital and examined. Dr. Wesley Dyer, the Coroner, testified that his examination revealed a tear in the midline on the backside between the vagina and rectum, black and blue bruising along the hymen, as well as excessive stretching of the hymenal opening. Dr. Dyer further testified that the bruising he observed would be consistent with trauma which had occurred within 24 or 25 hours.
The police recovered panties and a towel from a clothes hamper within the home, which Ashley showed them. Dr. Robert Giles, Scientific Director of the Gene Screen Laboratory in Dallas, testified that a DNA analysis revealed a mixture of genetic material belonging to Ashley and the defendant in the crotch of the panties and on the towel.
Based on the above evidence, Brossette was found guilty of aggravated rape. He was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence.

ERRORS PATENT
A review of the record reveals an error patent concerning the trial court's failure to inform the defendant of the prescriptive period for post-conviction relief. La. C.Cr.P. art. 930.8 provides that, at the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post-conviction relief. The record shows the court did not do this. This defect is not a ground to reverse the sentence or remand the case for resentencing. La.C.Cr.P. 921. The district court is directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of these proceedings. See State v. Reeves, 613 So.2d 1061 (La.App. 3rd Cir.1993), writ denied, 619 So.2d 543 (La.1993).

ASSIGNMENTS OF ERROR NOS. 1 AND 10
Defendant contends the trial court erred in denying his motion to quash the indictment, based upon alleged improper prosecutorial questioning of Dr. L.J. Mayeux, the Avoyelles Parish Coroner, during defendant's initial trial. At the time of the alleged improper questioning, defendant moved for a mistrial. The trial judge denied this motion.
In this appeal, following his second trial, defendant essentially contends that the judge presiding in his first trial erred in failing to grant a mistrial because of improper prosecutorial questioning. In other words, defendant contends that his motion for mistrial should have been granted during the first trial, and the court's failure to do so and his retrial on the same charge constitutes "double jeopardy" under the Fifth Amendment to the United States Constitution. These assignments of error are without merit because the assignments are irrelevant in the present case.
Defendant's first trial ended in a mistrial because the jury was unable to reach *1315 a verdict, not because of alleged improper questioning of Dr. Mayeux by the prosecutor. When a mistrial is granted because the jury is deadlocked, a second trial is a "manifest necessity". Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). In such a case of "manifest necessity", the double jeopardy clause does not attach to bar reprosecution.
While the validity of the first trial judge's denial of Brossette's motion for mistrial is irrelevant on this appeal, we observe that double jeopardy would only have attached at that point if defendant's motion for mistrial was successful and if the prosecutorial conduct giving rise to the successful motion for mistrial was misconduct specifically intended to provoke the defendant into moving for a mistrial. Conduct that may be considered "bad faith harassment" or "overreaching", even if sufficient to justify a mistrial on defendant's motion, does not bar retrial absent prosecutorial intent to subvert the protections afforded by the Double Jeopardy Clause. Oregon v. Kennedy, supra at 674, 102 S.Ct. at 2089.
Brossette's motion for mistrial was not successful. In his motion to quash filed prior to this second trial, defendant asserted that the prosecutor's questioning of Dr. Mayeux was improper and forced defense counsel to move for a mistrial. Brossette did not allege that the prosecutor's actions were intended to provoke defendant's motion for mistrial. While the prosecutor's actions may well have been "harassing" or "overreaching", the issue of his intent was foreclosed when the first trial judge, in his discretion, denied defendant's motion for mistrial. We will not consider the correctness of that decision rendered in the first trial on this appeal. Because a mistrial was ordered in the first trial for reasons other than intentional prosecutorial misconduct, defendant failed to set forth sufficient grounds to quash the indictment on the basis of double jeopardy. The second trial was a "manifest necessity". For these reasons, we find no merit in these assignments of error.

ASSIGNMENTS OF ERROR NOS. 2, 3 AND 4
These assignments of error concern the introduction of DNA evidence and articles of clothing from which it was obtained.
The State introduced in evidence panties worn by the victim on the day she was allegedly raped by the defendant. With leave of court, defendant made an oral motion to suppress based on Ashley's inability to positively identify the panties as those worn on the day of the rape. The court ruled that the State established a sufficient connection between the panties and the alleged offense such that the probative value thereof outweighed the possible prejudice to the defendant.
On direct examination, the victim identified S-15 as the panties she wore on September 5, 1991. On cross-examination, she was positive that S-15 was her panties but she could not remember if the pair was the same pair she wore on the day of the rape. The victim described how she led the police to the dirty clothes hamper from which they retrieved S-15 and two other pairs of her panties plus the towel the defendant placed under her. All four items were examined, and S-15 and the towel contained the DNA material from both the defendant and the victim.
The defendant argues that the lack of positive identification by the victim of S-15 as the panties she wore on the date of the rape should have rendered this evidence inadmissible.
Evidence is admissible at trial if the matter in question is found to be what its proponent claims. La.C.E. art. 901. It is sufficient if the evidence establishes that it is more probable than not that the object offered in evidence is the one connected with the case. State v. Jones, 587 So.2d 787 (La. App. 3rd Cir.1991), writ denied, 590 So.2d 78 (La.1991). Lack of positive identification goes to the weight of the evidence rather than its admissibility. Ultimately, connexity is a factual matter for determination by the trier of fact. State v. Butler, 615 So.2d 496 (La.App. 3rd Cir.1993).
The issue of identification goes to the weight of the evidence and not its admissibility. *1316 The evidence reflects that more probably than not, the panties offered as S-15 are those which were worn by Ashley on the day of the attack. Therefore, the trial court did not err by denying the defendant's oral motion to suppress the panties.
The defendant's next claim is that the trial court should have required the State to produce the actual laboratory technicians who prepared the samples and conducted the DNA tests. Dr. Robert Giles, who performed none of the tests, interpreted and explained the results in court. Dr. Giles was recognized as an expert witness in DNA analysis.
An expert witness may testify based on information obtained from others and the method of testing affects only the weight to be afforded the expert's conclusion. State v. Trahan, 543 So.2d 984, 994 (La.App. 3rd Cir.1989), affirmed, 576 So.2d 1 (La. 1990), citing State v. Austin, 282 So.2d 711 (La.1973), and State v. Fallon, 290 So.2d 273 (La.1974). The expert witness testifying in court need not be the person who actually drew the blood, performed the tests or compiled the statistics for comparison. He may rely on data prepared by other technicians. State in the Interest of Braden v. Nash, 550 So.2d 866 (La.App. 2d Cir.1989). The trial court did not err in allowing Dr. Giles to testify on the DNA test results basing his expert opinion on data prepared by others.
Finally, the defendant complains that he was erroneously denied a pretrial admissibility hearing with regard to the DNA evidence in violation of State v. Charles, 602 So.2d 15 (La.App. 3rd Cir.1992), writ granted in part, denied in part, and amended, 607 So.2d 566 (La.1992).
On May 15, 1992, this court rendered the Charles opinion which permitted a defendant to file a motion to suppress the results of DNA "fingerprinting". The opinion also authorized the trial court, after a contradictory hearing, to render a pretrial ruling on the admissibility of the DNA analysis. The Louisiana Supreme Court, in amending this court's judgment on November 20, 1992, ordered the trial court to also provide the defendant with timely access to documentation of the DNA analysis methodology utilized and to the data base used in making statistical comparisons.
Five months after this court issued the Charles opinion, the defendant's first trial commenced. Prior to the first trial, counsel for the defendant did not file a Charles motion to suppress, and both Dr. Giles and the defendant's DNA expert witness, Dr. Michael L. Murray, testified at the first trial. This first trial was declared a mistrial on October 23, 1992. The defendant's second trial began on March 9, 1993. On the morning of the defendant's second trial, defense counsel requested a Charles pretrial hearing concerning the admissibility of the DNA evidence. Counsel candidly admitted he learned about the Charles decision the day before. In denying the defense motion, the trial judge noted its untimeliness. Additionally, the court distinguished Charles, stating that the motion was unnecessary since defense counsel had been through the first trial, had his own DNA expert witness testify at the first trial, and all of the requested information had been provided before trial or presented at the first trial. In other words, all pertinent information in this case had previously been divulged. Therefore, the court concluded that a Charles hearing under the circumstances of the case was not warranted.
The trial court was correct. In Charles, supra at pg. 21, this court reasoned the primary concern in such cases is that the defendant receive a fair trial after having adequate pretrial discovery concerning the DNA evidence and the bases of the expert's opinion which the State seeks to introduce at trial. In the present case, the defendant had a complete first trial at which he was able to cross-examine the State's expert, Dr. Giles, and present his own expert witness. He also had the opportunity to cross-examine Dr. Giles during the second trial. The defendant never complained about inadequate State compliance with his discovery requests for the DNA tests. Counsel's lack of knowledge of the Charles opinion until ten months after its issuance does not excuse his untimely filing of the motion to suppress on the day of trial. Although the Charles procedure was not followed, its purpose was satisfied because *1317 defendant had full knowledge of the State's DNA evidence and he did not object to admissibility of the DNA evidence prior to or during the first trial.

ASSIGNMENTS OF ERROR NOS. 5, 6, 7 AND 8
Defendant contends the trial court erred in denying discovery of Child Protection Agency records which allegedly contained impeaching exculpatory information. The records were made discoverable during the first trial. The defendant also claims the trial court erred in failing to allow him to put on a defense through cross-examination as to the post-allegation investigation, conduct and relationship between the Child Protection Agency, law enforcement officials, and the victim and her family. Additionally, defendant specifies error in the trial court's exclusion of cross-examination and/or evidence presented by the defense as to post-accusation conduct of the parties involved. Defendant contends that it is possible that Ashley's testimony was "enhanced" or "bolstered" by her numerous meetings with persons associated with the Child Protection Agency and/or psychologists and psychological group therapy sessions. Assignment of error number eight, which specifies prohibition of the alleged victim's mother's testimony concerning post-accusation conduct of the Child Protection Agency and the police, was not argued in defendant's brief. It is deemed abandoned and will not be addressed.
The defense is entitled, upon request, to evidence which is favorable to the accused, where the evidence is material to guilt. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The rule has been expanded to include evidence which impeaches the testimony of a witness, where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Cobb, 419 So.2d 1237 (La.1982). The court may conduct an in camera inspection to determine the nature of the requested material. La.C.Cr.P. art. 718; State v. Cobb, supra at 1241. In State v. Thorne, 526 So.2d 1227 (La.App. 3rd Cir.), writ denied, 532 So.2d 174 (La.1988), we held that the requirements of Brady were satisfied when the trial judge conducted an in camera inspection and pointed out to the defense counsel any exculpatory information.
The record reveals that the defense was allowed a brief examination of the Child Protection Agency records during the first trial. No Child Protection Agency workers testified during the first trial. At the second trial, the defense requested an in camera inspection of the records to determine if any Brady or Giglio materials were contained therein. The trial court conducted an in camera inspection and found no Brady or Giglio material in the Child Protection Agency records. The court informed the defendant of the findings.
On appeal, defendant fails to specify which Child Protection Agency material qualifies as Brady or Giglio material. He merely alleges that such material is in the records and that he should not be denied access thereto. The defendant has no general constitutional right to unlimited discovery in a criminal case. If evidence requested is material or a substantial basis for claiming materiality exists, the prosecutor who receives a specific and relevant request must furnish the information to defense counsel or submit it to the judge for an in camera inspection. State v. Cobb, supra at 1241. In declaring that a defendant is entitled to a trial court in camera inspection to identify any Brady material, the United States Supreme Court reasoned that this procedure adequately ensures that the defendant's right to a fair trial is protected and, simultaneously, protects the sensitive and confidential nature of Child Protection Agency records. Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).
Defendant was granted an in camera inspection by the trial court. The prescribed procedures were complied with. The fact that the trial judge, in exercising his reasonable discretion, found no Brady or Giglio material in the evidence submitted is not grounds for reversible error.
The defendant also argues that the trial court erred in ruling in chambers that *1318 evidence of the Child Protection Agency's actions taken subsequent to the accusation being made was not admissible. The defendant contends this ruling erroneously restricted the evidence which he should have been able to present to the jury concerning the possible coaching of Ashley, the benefits she received following the accusations, her removal from the home and her relationship with the Child Protection Agency workers. In addition, the defendant asserts the information was relevant to show the degree of pressure put upon Michelle Brossette, the victim's mother, to testify against her husband, the defendant. Defendant apparently wished to impeach the credibility of the victim and the Child Protection Agency. The trial court ruled that defendant's allegations were not sufficient to show a pattern on the part of the Child Protection Agency which would affect the credibility determinations to be made by the jury.
Defendant fails to set forth any evidence which would substantiate the allegations raised. Mere speculation as to what occurred between the victim, her mother and the Child Protection Agency is insufficient to make such claims admissible. Additionally, we fail to see what relevance such unsubstantiated evidence has to the issue at hand, whether the defendant raped his stepdaughter. Without any substantiation, the trial court correctly decided not to allow any evidence of the post-accusation conduct of the parties and the Child Protection Agency. These assignments of error lack merit.

ASSIGNMENT OF ERROR NO. 9
Defendant contends that the trial court erred in denying his motion for mistrial filed when the defense, which built much of its case on negative vaginal washings, learned that no classic vaginal washings were performed on the victim. Defendant's motion for mistrial was based upon La.C.Cr.P. art. 729.5, which provides the court with discretionary power to grant a mistrial when a party fails to comply with Chapter 5 of Title XXIV of the Code of Criminal Procedure, entitled "Discovery and Inspection".
A rape kit was performed on the victim a day after the alleged incident. The rape kit was administered by Dr. Wesley Dyer and Sergeant Ray Delcomyn. Dr. Dyer did not do a "classic" vaginal wash, instead he chose to do vaginal swabs. Sergeant Delcomyn testified that a vaginal wash "is performed by simply opening up a small vile [sic] of saline solution, squirting in [sic] into the vaginal area allowing it to wash down the sides of the vagina and, as it pools, the doctor extracts that with a small suction device and places it in a tube". Dr. Dyer stated that he did not do a standard vaginal wash since the victim was in a lot of discomfort. In lieu thereof, a vaginal swab was taken, the stem broken off, and placed in a vial along with saline solution in order to obtain any material present on the swab.
In his motion for mistrial, defendant alleged that he had built an affirmative defense around the fact that thorough vaginal washings of the victim were negative for semen. This supposed fact was allegedly revealed during pretrial discovery. Defense counsel did not know that a "classic" vaginal wash was not performed until he heard the testimony of Sergeant Ray Delcomyn during the second trial. Sergeant Delcomyn testified that "the standard wash was not done ... that question was never asked of me in the first trial". Although numerous pretrial motions were made pursuant to formal discovery, the defendant alleges that the State never made it known that no thorough "vaginal washings" were performed. The document upon which this fact was recorded was never given to the defendant. The court had an in-chambers hearing and denied defendant's motion for mistrial, stating that "[i]n the event, that the court determines there is [a problem with the different use of the washing] through the trial, the court, on its own motion, can grant a mistrial ...". The court did not grant a mistrial.
Mistrial is a drastic remedy which should be granted only in situations which might result in substantial prejudice to the defendant. State v. Burdgess, 434 So.2d 1062 (La.1983). On review, because the trial court had discretion to deny defendant's motion for mistrial for the State's failure to comply with discovery statutes, the defendant must show prejudice resulted from the *1319 trial court's adverse order before a reversal of conviction can be granted. State v. Norwood, 396 So.2d 1307 (La.1981).
In this case, the defendant fails to show how he was prejudiced by not knowing that a "classic" vaginal washing was not performed. The discovery answers allegedly filed by the State which indicated that the vaginal washings of the victim were negative for semen were not made a part of the appellate record. Nevertheless, the record indicates that Dr. Mayeux, a defense expert, testified that "[a]ll the swabs, all the washings, were ... negative". He made it clear to the jury that no semen was found in the victim. This was brought to the attention of the jury through the defendant's own witness as well as the State's witness, Sergeant Delcomyn. At best, defendant was unintentionally misled during discovery. However, he was not denied the opportunity to present the ultimate fact to the jury that the vaginal examination was negative for semen. We find no prejudice in the trial court's order.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 11
Defendant next contends that the trial court erred in not allowing defendant to highlight to the jury specific material contained in three publications introduced into evidence. Defendant argues that he should have been allowed to point out certain portions of the materials to impeach the victim on the issue of her sexual knowledge.
Defendant argues that the victim testified that prior to the sexual attack, she knew little if anything about male/female sexual relations. However, her mother testified that she found sexually related literature out of place in the home and, on at least one occasion, under the victim's bed.
The court allowed the introduction of these publications into evidence. However, the court prohibited defense counsel form highlighting to the jury specific sexual information contained therein. Defendant contends the court's ruling prejudicially limited the defense in the presentation of its case.
As stated by this court in State v. Trahan, 543 So.2d 984 (La.App. 3rd Cir. 1989), affirmed, 576 So.2d 1 (La.1990), "the right to present a defense is not without limits". No proof was presented that anyone had actually seen Ashley reading the books, much less specific portions thereof. There was no probative value in permitting the defense to select excerpts, which it had no way of proving Ashley had seen, to "highlight" to the jury. She testified that her mother had shown her some books "about periods and things like that", but denied having been given books about sexual intercourse or ejaculation. Mrs. Brossette testified that, on two occasions, she found a book entitled A Woman's BodyAn Owner's Manual, in Ashley's room. On cross-examination, however, Mrs. Brossette testified that she never saw Ashley actually read the book. Furthermore, no evidence was presented to substantiate defendant's contention that Ashley read the other two books much less read the portions defendant wished to highlight to the jury.
Clearly, defendant failed to establish a sufficient foundation for the highlighting of specific portions of the literature to the jury. For this reason, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 12
Defendant contends that the trial court erred in excusing a selected and seated juror prior to deliberation, who sat through the entire trial, because of her knowledge of a character witness.
Ms. Ora Sanders, the juror, was excused by the court, over defense objection, due to employment concerns since a defense character witness, Mr. Fred Jackson, was her supervisor at work. Although Ms. Sanders testified that her knowledge that Mr. Jackson was a defense witness would not change her vote, she would be "scared afterwards" because, as she stated, she could lose her job if he discovered and did not agree with her vote. Mr. Jackson did not testify, but his testimony was stipulated to by the parties. The stipulation was favorable to the defendant.
La.C.Cr.P. art. 789 allows alternate jurors to "replace jurors who become unable *1320 to perform or disqualified from performing their duties prior to the time the jury retires to consider its verdict". The trial court has discretion to utilize the service of an alternate juror, rather than to grant a mistrial, upon a proper finding that this is the best course of action. State v. Fuller, 454 So.2d 119 (La.1984). The defendant contends that, since Ms. Sanders was not incompetent to serve (La.C.Cr.P. art. 796) and she stated that her knowledge of Mr. Jackson would not change her vote, it was improper to excuse her from jury service.
The trial court did not abuse its discretion in excusing Ms. Sanders from jury service. The record indicates that Ms. Sanders could possibly have had trouble remaining impartial due to employment concerns. The trial court could reasonably have concluded that she would have been affected during deliberations and in voting due to her relationship with Jackson. This is so, despite the fact that Jackson did not actually testify, because of Ms. Sanders' reasonable fear that she could be fired if he discovered she voted unfavorably to defendant. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 13
Defendant contends that the trial court erred in failing to excuse a juror, Ms. Mary Wolfe, who had several communications with Ms. Sanders concerning her knowledge of the reputation of a defense character witness, Mr. Jackson. During questioning by the defense, it was learned that Ms. Sanders, who was properly excused from jury service, had expressed her job concerns to Ms. Wolfe while the two rode home together. Defendant argues that Ms. Wolfe should have been discharged from jury service due to the conversation with Ms. Sanders.
The court questioned Ms. Wolfe about her conversation with Ms. Sanders. The relevant part of the colloquy is as follows:
BY THE COURT: Do you remember what [Ms. Sanders] said about Mr. Jackson or to you concerning the ...
BY MS. WOLFE: Uh, yes, sir. She had told me all along that she felt vulnerable about being up here and being the only black and that she felt vulnerable about her job. And I think she talked with you. I did not know her before the trial started. She had car trouble. Her house was on the way home with me, so I took her home. So I knew that ...
BY THE COURT: In particular, though, did she make any ... Do you remember what she said about the witness, Fred Jackson?
BY MS. WOLFE: Uh, yes, sir. She just said that he was her boss and that she was... she was already afraid about her job because of having to be off so long and that she just was afraid that, well, however the decision went that he might take repercussions against her in the future.
BY THE COURT: Did she say anything to you that would give you any indication as to the character or nature of Mr. Jackson?
MS. WOLFE: No, sir, other than that she said he was even-tempered but that sometimes he fired people that she didn't know the cause.
After this questioning of Ms. Wolfe, the trial court denied defendant's motion to excuse Ms. Wolfe. Defendant, citing State v. Charles, 377 So.2d 344 (La.1979), and State v. Duplissey, 550 So.2d 590 (La.1989), argues that any private conversations or contact with a juror in violation of a sequestration order is presumptively prejudicial. Both of these cases are distinguishable from this case. In State v. Duplissey, supra, the unauthorized communication was between a court official and a juror during jury deliberation. The conversation in the present case involved two jurors during trial, not during jury deliberations. In State v. Charles, certain members of the jury were threatened during the course of the trial. The Louisiana Supreme Court held that the trial judge erred in denying an evidentiary hearing to determine the facts surrounding the threat, and stated the law as follows:
In a criminal case, any private communication, contact or tampering directly or indirectly with a juror during a trial about the matter pending before the jury is deemed *1321 presumptively prejudicial. State v. Charles, supra at 345.
That case did not involve a conversation between two jurors, as in the present case, but the possibility of outside threats made towards jurors to influence their decisions.
We conclude that the court correctly allowed Ms. Wolfe to remain on the jury. This determination was made after a hearing out of the presence of other jury members. Ms. Wolfe's impartiality was not compromised. She was not told that Mr. Jackson routinely fired people without cause. She was merely told that he sometimes fire workers for reasons unknown to Ms. Sanders. This is not reputation evidence sufficient to affect Ms. Wolfe's decision. Furthermore, Mr. Jackson did not testify. In fact, none of the six defense character witnesses testified. In lieu of their testimony, the State stipulated with the defendant that the character witnesses, if called to testify, would state "... that [defendant's] general reputation in the community is that of good moral character and that of truthfulness". We fail to perceive how Ms. Wolfe's knowledge of Mr. Jackson's propensity to fire workers for cause unknown to Ms. Sanders in any way prejudiced the defendant. Clearly, Ms. Wolfe was in no danger of reprisal. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 15
Brossette next contends that the trial court erred in allowing serologist, Dawn Tingle, to testify as an expert in the field of seminal transfer without a proper foundation for expert testimony. Defendant also argues that the court erred in allowing Ms. Tingle to testify as an expert as to why no semen was found in the vaginal swabs or washings.
Ms. Tingle testified as to why possibly there was no seminal fluid found in the vaginal swabs. She stated that, since the victim saw the seminal fluid come out of the suspect, not finding seminal fluid in the victim was not unexpected. Defense counsel objected to this line of questioning, arguing that it was outside of Ms. Tingle's field of expertise. The court overruled defense counsel's objection. Ms. Tingle stated further that, if the victim takes a bath or shower, this would affect the loss of seminal fluid. Additionally, if testing was not done until some time after the occurrence, the loss of seminal fluid would be expected.
La.C.E. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The question of whether a witness is an expert, the scope of his expertise and breadth of his opinion are for the most part within the discretion of the trial judge. Absent an abuse of discretion, the trial judge's decision should not be overturned. Dye v. Schwegmann Giant Super Markets, Inc., 599 So.2d 412 (La.App. 4th Cir.1992). We find no abuse of discretion in allowing Ms. Tingle to testify on this subject.
Ms. Tingle did not testify outside her field of expertise. Ms. Tingle testified that she has been employed as a Criminalist in the field of forensic serology for approximately three years and has been qualified as an expert in five state district courts. Serology is the determination and typing of blood and other body fluids. Ms. Tingle was properly allowed to give her "opinion" of how seminal fluid could be lost and thus not present when the testing for seminal fluid is administered.
Defendant also objected to Ms. Tingle being allowed to testify as to the transference of sperm from one piece of clothing to another. One of Brossette's defenses was that, after having sexual intercourse with Ashley's mother the night before the alleged attack, he wiped himself with an article of clothing or towel taken from the clothes hamper into which Ashley later placed her panties. He argued that the seminal fluid from the towel then migrated or transferred to Ashley's panties. The trial court overruled defendant's objection and Ms. Tingle testified as follows:
Q. What's ... What is the likelihood of seminal stains transferring in a case like *1322 this from other kinds of material onto the crotch of a little girl's panties?
* * * * * *
A. In an average male, the ejaculation is approximately one teaspoon, which is a small amount. That is just one ejaculate for an average male. Once that got on another item of clothing, the time frame for that to dry would not take very long. And for a transfer stain to come from one item of clothing to another item would be highly unlikely in the dilution that I found it to be in this pair of panties. It was also only found in the crotch area of ... this pair of panties and nowhere else on the... pair of panties. So I would say, in my opinion, it is very highly unlikely.
Q. Okay.... No other seminal stains on these panties, except in the crotch?
A. That is correct.
The defendant argues that although Ms. Tingle does test for semen, she admittedly has done no actual research as to probabilities of transference and could name no books which she allegedly read on the subject of transference. Ms. Tingle testified that she has investigated cases involving transference. Furthermore, she has read books and attended seminars dealing with the phenomenon. Because she is an experienced serologist, the fact that she has done no actual research on probabilities of transference and the fact that she could not recall any of the books she read on the subject does not prevent her from testifying in that area. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 17
By this assignment of error, defendants contends the trial court erred in failing to either grant a mistrial or admonish the jury when the prosecutor inferred that the victim's sister was changing her testimony from the previous trial.
Defendant argues that the prosecutor, through his questioning of Alyssa Knight, inferred to the jury that Alyssa was changing her story. Defendant claims that this questioning of Alyssa, the victim's ten year old sister, is grounds for a mistrial. The defendant made a motion for mistrial, which motion was denied. He did not thereafter request admonishment of the jury. On direct examination, Alyssa stated that she remembered noticing blood on the towel which defendant allegedly made Ashley lay on during the rape. She stated and the defendant contends that the blood was wiped from his leg onto the towel in her presence.
On cross-examination, the prosecutor questioned Alyssa as follows:
Q. The last ... The last time you gave testimony about this, you didn't mention anything about blood, did you?
A. No, sir.
Q. Can you tell us why that is?
A. No, sir.
Q. You don't remember why?
A. No, sir.
After this exchange, the defendant made a motion for mistrial on the basis that the prosecutor had impeached the witness from his own memory without presenting a transcript of her prior testimony under oath. In other words, defense objected to the prosecutor being allowed to infer that Alyssa was lying without having proof of a prior opposite response. Defendant argues that, as prohibited in State v. Floyd, 544 So.2d 616 (La.App. 3rd Cir.1989), the prosecutor was putting his credibility against that of a witness.
The blood is significant because it was located on a towel which Ashley said was placed beneath her during the first sexual attack. The defendant argues that the blood was deposited on the towel when he used the towel to wipe a wound on his leg.
Although there was no transcript of the previous trial, Alyssa readily admitted she did not testify about the blood in her earlier testimony. Thus, the prosecutor was not pitting his credibility against Alyssa's. They both agreed that her testimony differed from that of the first trial.
Mistrial is a drastic remedy which should only be used in those situations which might result in substantial prejudice to the defendant. State v. Burdgess, supra. As the defendant fails to prove any prejudice suffered, the trial court correctly denied his motion for mistrial. Furthermore, as defendant did not *1323 request a jury admonition, the court did not err in failing to do so.

ASSIGNMENT OF ERROR NO. 20
Defendant contends that the trial court erred in denying his motion for new trial, in that the law and evidence do not legally sustain a verdict of guilty to the crime of aggravated rape. His sole substantive argument centers on the victim's inability to identify the panties she wore on the day of the attack.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore the appellate court should not second guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, supra, citing State v. Richardson, 425 So.2d 1228 (La.1983).
In order for the State to obtain a conviction, it must prove the essential elements of the charged offense, aggravated rape, beyond a reasonable doubt. La.R.S. 14:41 defines rape as follows:
A. Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
Defendant was indicted for violating La.R.S. 14:42 A(4) which defines one of five separate classes of aggravated rape as follows:
A. Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
* * * * * *
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.
In the present case, it was established that the victim was ten years old at the time of the rape. Ashley testified that, after becoming ill at school and being left by her mother at home with the defendant, he walked into her room and instructed her to get off of the bunkbed and onto the floor. He then removed his shorts and her underwear. The defendant placed a towel under her, raised her nightgown, and penetrated her while touching her breasts. Ashley testified that she screamed and told him to stop. She saw "white milky stuff" coming out of the defendant's penis. The defendant told her to clean herself and to put some toilet tissue in her panties. Ashley did as she was told and went to sleep. She testified that, after a short time, the defendant came into her room again and told her to go into her sister's room. The defendant followed her into the room and removed his jeans and her underwear. The defendant did not penetrate on this occasion but did ejaculate. Ashley stated that her grandmother, Gloria Allen, arrived at the home and honked her car horn, whereupon the defendant put his jeans on and told Ashley to clean herself up. Gloria Allen testified that she saw the defendant on the day in question wearing blue jeans and nothing more. She also stated that, when she arrived, Ashley was crying because she "didn't feel good" and expressed a desire to sleep at her grandmother's that evening.
Ashley returned to school the next day and told her teacher, Mrs. Margaret Laborde, that "she needed to talk to me about something". Mrs. Laborde testified that Ashley told her that "her stepfather came in her room, made her take off her clothes and he got on top of her". The defendant denies ever touching or raping Ashley.
In State v. Rives, 407 So.2d 1195 (La.1981), the Supreme Court held that despite the *1324 absence of any scientific evidence of sexual intercourse, the testimony of the victim was sufficient to establish "sexual penetration". See also, State v. Lewis, 577 So.2d 799 (La. App. 2d Cir.1991). In the case sub judice, not only is there the unwavering testimony of the victim, there is also the corroborating testimony of other witnesses as well as scientific and medical evidence.
Dr. Wesley Dyer, Coroner of Rapides Parish, testified that the victim had "black and blue bruising ... along the hyman or maidenhead or the ring around the opening to the vagina ... also a tear in the midline on the backside between actually the vagina and the rectum ... [and] an excessive hymenal opening". Dr. Dyer further testified that the black and blue bruising would be consistent with trauma which had occurred within twenty-four to twenty-five hours. Dr. Dyer testified that his findings were consistent with the history Ashley gave.
The police recovered the panties worn by the victim along with the bloody towel from the location indicated by her. A DNA analysis revealed a mixture of genetic material belonging to Ashley and the defendant in the crotch of the panties and on the towel. The defendant testified at trial that if his sperm was found on the panties worn by Ashley, it was because he wiped himself with the panties or another article of clothing from the hamper after having sex with his wife, which article of clothing could have come into contact with Ashley's panties. Ms. Dawn Tingle, a serologist, testified that it was highly unlikely that the genetic material could have transferred solely into the crotch of Ashley's panties, as contended by the defense.
In the present case, the jury did not believe defendant's testimony that he did not rape the victim. As noted previously, the testimony of the victim was corroborated by other evidence. The victim, although eleven years old at the time of trial, was able to describe the defendant's act in sufficient detail to support the jury's finding that penetration had occurred.
Viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of aggravated rape were proven beyond a reasonable doubt. The evidence presented was sufficient to support the aggravated rape conviction. Accordingly, the trial court did not err in denying defendant's motion for new trial.
For these reasons, defendant's conviction and the sentence imposed are affirmed. The trial court is ordered to inform the defendant of the La.C.Cr.P. art. 930.8 prescriptive period for post-conviction relief.
AFFIRMED.