687 So.2d 529 (1996)
STATE of Louisiana, Appellee,
v.
George Paul "Joey" SMITH, DefendantAppellant.
No. 96-261.
Court of Appeal of Louisiana, Third Circuit.
December 30, 1996.
*533 Richard Phillip Ieyoub, Baton Rouge, Morgan H. Goudeau III, Opelousas, David Michael Miller, Assistant District Attorney, Gary C. Tromblay, Houma, for plaintiff-appellee State of La.
J. Michael Small, Phyllis E. Mann, Alexandria, for defendant-appellant Smith.
Before YELVERTON, WOODARD and AMY, JJ.
WOODARD, Judge.
Defendant, George Paul Smith, was charged by bill of indictment with first degree murder, a violation of La.R.S. 14:30 A(4). On June 29, 1995, a jury returned a unanimous verdict of guilty as charged. On July 14, 1995, the defendant was sentenced to life imprisonment at hard labor, to be served without benefit of parole, probation or suspension of sentence. He appeals his conviction to this court.

FACTS
On February 12, 1985, Sheila Lemoine Smith, the wife of the defendant, George Paul Smith, was shot to death in their home located in Whiteville, Louisiana, a rural area north of St. Landry Parish. At approximately 7:30 a.m. on the morning of February 12th, shortly before the murder, Smith drove the couple's two daughters, Jill and Kristen, to the school bus stop. Smith was also accompanied *534 by his youngest son, George, Jr., a toddler. Sheila Lemoine Smith was, therefore, alone in her house. After dropping his daughters off at the bus stop, Smith attended to some errands before returning home.
Sheila's body was found by Smith on the floor of the laundry room upon his return. She was wearing a robe with no undergarments, a towel around her head, a diamond ring and a necklace. Apparently, she had taken a shower just prior to her murder. On the floor next to her body, investigators discovered a large flashlight. There was no evidence of forced entry into the home. It was determined that Sheila sustained five gunshot wounds: one to the chest, and four to the face. The St. Landry Parish Coroner estimated that Sheila was murdered shortly after 7:30 a.m. The only items reported missing by Smith were the contents of a jewelry box belonging to Sheila located in the master bathroom. Although police questioned Smith extensively following the murder, there was no viable evidence linking him to the crime. For more than seven years, Sheila Lemoine Smith's murder remained unsolved.
A break in the case came in March 1992. At that time, Smith was incarcerated at the Lafayette Parish Correctional Center awaiting trial in federal court on drug charges of which he has since been convicted. He attempted to send two letters to Albert Lavalais, who, at the time of Sheila's murder, was employed as a farmhand by Smith. After reading the letters, federal law enforcement officials contacted Detective Rene Speyrer of the St. Landry Parish Sheriff's Office. After reviewing Smith's letters, Speyrer questioned Lavalais about the murder. On April 14, 1992, Speyrer picked up Lavalais at his Cottonport home and transported him to the Louisiana State Police Headquarters in Baton Rouge. On that morning, Albert Lavalais confessed to the murder of Sheila Lemoine Smith. His confession was videotaped. On the tape, Lavalais claimed that Smith offered him money to commit the murder. In addition, Lavalais revealed pertinent information about the victim, the murder scene, the stolen jewelry and the murder weapon. Although the stolen jewelry was recovered, the murder weapon was never found.
On April 28, 1992, a St. Landry Parish Grand Jury charged Smith, by bill of indictment, with first degree murder, a violation of La.R.S. 14:30 A(4). On May 22, 1992, with counsel, Smith appeared in court for arraignment and entered a plea of not guilty to the crime of first degree murder.
Also indicted for the murder was Albert Lavalais, the alleged trigger-man. The state asserted that Smith agreed to pay him fifty thousand dollars ($50,000.00) in return for the murder of Smith's wife and that Smith's motive for the murder was the collection of five hundred thousand dollars ($500,000.00) in life insurance proceeds. The Lavalais and Smith trials were severed. In September of 1993, Albert Lavalais was found guilty of the first degree murder of Sheila Smith and sentenced to death and is currently on death row. The Louisiana Supreme Court recently affirmed his conviction and sentence in State v. Lavalais, 95-0320, 685 So.2d 1048 (La.11/25/96).
In June 1995, Smith was brought to trial. Pursuant to La.Code Crim.P. art. 623.1, venue for jury selection was moved to Calcasieu Parish. After jury selection, the panel was transferred to St. Landry Parish for trial. Smith's trial by jury commenced on June 21, 1995. On June 29, 1995, the jury returned a unanimous verdict of guilty as charged for the first degree "murder-for-hire" of his wife, Sheila Lemoine Smith. Smith timely filed a Motion for a New Trial which was subsequently denied by the trial court. On July 14, 1995, he was sentenced to life imprisonment at hard labor, to be served without benefit of parole, probation or suspension of sentence. He now appeals his conviction to this court, alleging twenty-one assignments of error. Nine assignments of error have been expressly abandoned by him in his original brief to this court. He presents the remaining twelve assignments of error in ten arguments.

ASSIGNMENTS OF ERROR
Smith originally asserted the following twenty-one assignments of error:

*535 1. The trial court erred in limiting Mr. Smith's voir dire of venire persons Jerry A. Johnson and Darlene Koonce (abandoned).
2. The trial court erred in denying Mr. Smith's request for the removal from the venire of venire person Mrs. Roy Conway following the state's erroneous statement of law critical to this case in the presence of Mrs. Conway (abandoned).
3. The trial court erred in denying Mr. Smith's request for the removal from the venire of venire person Eileen J. Suarez following the trial court's prejudicial remarks to defense counsel in the presence of Ms. Suarez.
4. The trial court erred in denying Mr. Smith's challenge for cause of venire person William Bertrand.
5. The trial court erred in denying defendant's Motion for Mistrial on the basis of extensive violations of sequestration in a capital case.
6. The defendant was prejudiced by the remarks of the state in its opening argument and the trial court erred in denying defendant's Motion for Mistrial on the basis of these remarks.
7. The defendant was prejudiced by the remarks of the state in its closing argument and in its rebuttal argument and the trial court erred in denying defendant's Motion for Mistrial on the basis of these remarks.
8. The trial court erred in accepting witness Rene Speyrer as an expert in "Detective Criminal Investigation" and in ruling admissible opinion testimony of witness Rene Speyrer.
9. The trial court erred in denying Mr. Smith the right to cross-examine witness Rene Speyrer regarding confessions by persons other than Mr. Smith (abandoned).
10. The trial court erred in denying Mr. Smith the right to obtain a copy of the transcript of a July 22, 1992 interview by expert witness Rene Speyrer of two unindicted confessors, which defendant had not previously been provided, during the cross-examination of expert witness Rene Speyrer (abandoned).
11. The trial court erred in denying Mr. Smith the right to recross-examine witnesses Rene Speyrer and Libby Lewis regarding testimony given on redirect examination (abandoned).
12. The trial court erred in ruling admissible crime scene photographs, State Exhibits 3-A, 3-B, 3-C, 3-D, 3-E, 3-H, 3-I, and 3-J, all of which were duplicative of the crime scene videotape, State Exhibit 2 (abandoned).
13. The trial court erred in ruling admissible the Letter or Letters of defendant, State Exhibit 7-A, because it contained inadmissible other crimes evidence and because it was irrelevant.
14. The trial court erred in ruling admissible the videotaped confession of Albert Lavalais, State Exhibit 13, because it violated the defendant's state and federal constitutional rights to confront and cross-examine the witnesses against him, because it contained hearsay statements not within any exception to the hearsay rule, and because it contained inadmissible references to the taking of a polygraph examination.
15. The trial court erred in allowing the State to call as a witness in the presence of the jury the alleged trigger-man Albert Lavalais for the purpose of having him refuse to testify in the presence of the jury.
16. The trial court erred in ruling admissible the testimony of witness Cefus Lacart containing inadmissible references to hearsay statements of Albert Lavalais in violation of Mr. Smith's state and federal constitutional rights to confront and cross-examine the witnesses against him and containing hearsay statements of Albert Lavalais not within any exception to the hearsay rule (abandoned).
17. The trial court erred in ruling admissible the testimony of witness Matthew Leary referring to statements *536 alleged to have been made by Mr. Smith that were not limited to a particular time but rather were alleged to have been made in 1984 (abandoned).
18. The trial court erred in ruling admissible the testimony of witness Charlene Coco regarding statements alleged to have been made by Mr. Smith that Albert Lavalais considered Mr. Smith to be his "parrain" (abandoned).
19. The trial court erred in denying Mr. Smith the right to impeach the testimony of witness Vernon Mullens by extrinsic evidence through questioning of witness Charlie Shannon.
20. The defendant was prejudiced by the testimony of witness Vernon Mullens, called in rebuttal by the state, when he blurted out in the presence of the jury, "The defendant has a hit out on me right now," and the trial court erred in denying Mr. Smith's oral Motion for Mistrial based on this statement made by a prosecution witness in the presence of the jury.
21. The trial court erred in refusing to give defendant's requested jury instructions 1, 2, 3, 4, 5, and 6.

LAW

ERRORS PATENT
La.Code Crim.P. art. 920 provides the scope of review on appeal, as follows:
The following matters and no others shall be considered on appeal:
(1) An error designated in the assignment of errors; and
(2) An error that is discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence.
In accordance with this article, all appeals are reviewed by this court for errors patent on the face of the record. After review, this court notes two errors patent on the face of the record.
The record does not indicate that the defendant was given credit for time served. La.Code Crim.P. art. 880 provides that when imposing sentence, the court shall give the defendant credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence. The record indicates that the trial court did not do so. Thus, the sentence should be amended to reflect that the defendant is given credit for time served prior to the execution of the sentence. See La.Code Crim.P. art. 882(A). Although resentencing is not required, this court should remand the case to the district court to amend the commitment and minute entry of the sentence to reflect that the defendant is to be given credit for time served. State v. Moore, 93-1632 (La. App. 3 Cir. 5/4/94); 640 So.2d 561, writ denied, 94-1455 (La.3/30/95); 651 So.2d 858. Even, as in this case, when a defendant is given a life sentence, the jurisprudence is clear that recipients of life sentences should be given credit for time served. See, e.g., State v. Howard, 626 So.2d 459 (La.App. 3 Cir.1993).
In addition, the record does not reflect that the defendant was informed of the three year period for seeking post-conviction relief. La.Code Crim.P. art. 930.8 provides that, at the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post-conviction relief. The purpose of the notice of Article 930.8(C) is to inform defendant of the prescriptive period in advance of its commencement. The failure of the trial court to so inform the defendant has no bearing on whether the sentence is excessive and thus is not grounds to reverse the sentence or remand the case for resentencing. La.Code Crim.P. art. 921. Moreover, pursuant to La.Code Crim.P. art. 914 or 922, the three year prescriptive period does not begin to run until the rendition of judgment. Thus, we now direct the district court to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. See State v. Fontenot, 616 So.2d 1353 (La. App. 3 Cir.), writ denied, 623 So.2d 1334 (La.1993).

*537 FORMER ASSIGNMENTS OF ERROR NUMBERS 1, 2, 9, 10, 11, 12, 16, 17 & 18
The defendant, in his brief, has expressly waived these former assignments of error. As such, the defendant did not argue them in the brief presented for review to this court. Failure to argue an assignment of error constitutes waiver of that error. State v. Lewis, 576 So.2d 1106 (La.App. 3 Cir.), writ denied, 580 So.2d 669 (La.1991); Uniform RulesCourts of Appeal, Rule 2-12.4. Therefore, these assignments of error are deemed abandoned. The remaining assignments of error will be addressed in the order in which they were presented in the defendant's brief to this court.

ASSIGNMENT OF ERROR NUMBER 5
In his first assignment of error, and in his supplemental brief, Smith contends that the trial court erred in denying his Motion for Mistrial based on extensive violations of sequestration in a capital case which occurred when the jury was being impaneled in Calcasieu Parish. The defendant alleges that the temporary jurors were exposed to substantial outside communication in violation of sequestration and that, therefore, a reversal or a new trial should be granted. The defendant points to four specific incidents of sequestration violations, one involving temporary juror Bobbie Murphy (who was subsequently dismissed), and the rest involving the remaining temporary venire persons. For the following reasons, we find that this assignment of error lacks merit.
La.Code Crim.P. art. 791 addresses the sequestration of jurors and juries and provides, in pertinent part:
A. A jury is sequestered by being kept together in the charge of an officer of the court so as to be secluded from outside communication, except as permitted by R.S. 18:1307.2.
B. In capital cases, after each juror is sworn he shall be sequestered, unless the state and the defense have jointly moved that the jury not be sequestered.
The purpose of sequestration is to isolate jurors from outside influences, or the possibility thereof, in order to insure the verdict reached by the jurors is based solely on the evidence presented at trial. State v. Maze, 596 So.2d 218 (La.App. 3 Cir.), writ denied, 604 So.2d 963 (La.1992). Since the purpose of sequestration is to protect jurors from outside communication, the rule does not present us with a rigid requirement that jurors be kept together, continually, in one single group. State v. Sheppard, 350 So.2d 615 (La.1977).
The Louisiana Supreme Court has consistently treated significant sequestration violations as reversible error. State v. Schrader, 518 So.2d 1024 (La.1988), cert. denied, 498 U.S. 903, 111 S.Ct. 265, 112 L.Ed.2d 221 (1990). Therefore, in capital cases, sequestration is to be strictly enforced and reversible error presumed in the event of a violation. State v. Smith, 322 So.2d 197 (La. 1975). Upon separation of the jury, a presumption of prejudice arises, which can only be rebutted if it appears that the accused suffered no prejudice. State v. Parker, 372 So.2d 1037 (La.1979). Further, in Parker, 372 So.2d at 1038 (citations omitted), the court held:
This jurisprudential rule is, however, limited by those cases holding that where circumstances are such as to reasonably overcome the presumption of prejudice and where it affirmatively appears that no prejudice to the accused could have resulted, the presumption may be rebutted, so that the mere separation of a juror briefly may be held to be insufficient ground to set aside a verdict.
Therefore, the presumption of prejudice is rebuttable, and in cases where sequestration violations occur and prejudice to the accused is not apparent, the state will be given the opportunity to rebut the presumption of prejudice. In other words, in order to find reversible error due to violations of the strict sequestrations requirements, a court must find that the circumstances suggest that the defendant has suffered prejudice and that the state has failed to rebut the presumption of prejudice.

BOBBIE MURPHY
On Sunday, June 18, 1995, temporarily accepted juror, Mrs. Bobbie Murphy, *538 learned that her mother was seriously ill. St. Landry Parish Sheriff's Deputy Louis Fogleman drove Mrs. Murphy to Alexandria, Louisiana, to visit her mother at Cabrini Hospital for approximately one and one-half hours. After four or five hours of separation, Mrs. Murphy rejoined the other jurors. On Monday, June 19, 1995, the trial court conducted a hearing concerning Mrs. Murphy's separation. Deputy Fogleman testified that Mrs. Murphy was told, in advance, not to discuss the case with anyone. Additionally, Mrs. Murphy's family was told not to discuss the case with her. Mrs. Murphy remained in Deputy Fogleman's presence the entire time and obeyed his instructions. She was returned to the hotel where the other jurors were being sequestered that same evening.
Based on the letter of the law, a sequestration violation did occur when Mrs. Murphy was allowed to be exposed to outside communication. As the court stated in Parker, "[I]n capital cases especially, ... upon a separation of a juror after he is sworn, a presumption of misconduct arises...." Id. at 1038. As stated above, however, if the presumption is properly rebutted, the brief separation of a juror may be insufficient grounds to set aside the verdict. In the case sub judice, the trial court went to great lengths to determine whether Mrs. Murphy's temporary separation prejudiced the defendant or exposed Mrs. Murphy to outside communication.
On June 19, 1995, the first order of business at trial was to conduct a hearing regarding her separation. At that time, the trial judge allowed both the state and the defense to question Mrs. Murphy regarding the circumstances of her separation.
Q. Now did in fact this deputy sheriff drive you to Alexandria?
A. Yes, sir.
Q. Who was the deputy?
A. Deputy Fogleman.
* * * * * *
Q. Okay. Now he drove you in a sheriff's car to Alexandria?
A. He did.
Q. What hospital did you go to?
A. Cabrini.
Q. Cabrini. Now when you arrived at the hospital, did the deputy accompany you to your mother's room?
A. He did. As we entered the hospital, my brother and his wife were standing outside. I recognized them. We walked up to them, I introduced them to Deputy Fogleman and we went into the elevator and went up directly to the room.
Q. During the time that Deputy Fogleman and yourself met with people and you walked up to thegot on the elevator and went to the room, was any discussion of this casedid any discussion of the case take place?
A. No sir, the condition of my mother was the discussion.
Q. The condition of your mother was foremost on everyone's mind?
A. They were trying to bring me up to date on what was going on at that moment.
Q. And was there any communication in any way from any person concerning this case?
A. No, sir.
* * * * * *
Q. How long did you get to visit with your mother?
A. I think we left aboutI think we got there around 3:30 and we started out of the hospital at about five to five because he said, if you feel like you can leave now, I think we should start back. And so it was say 3:30 to about a quarter to five.
* * * * * *
Q. Now Mrs. Murphy, during the time that you were at the hospital and visiting in your mother's room, was Deputy Fogleman with you at all times?
A. Yes, sir. I'm sure that was not pleasant for him, but he did.
Q. He stayed with you in the room?
A. Yes, sir.
Q. He went into the room with you?
A. Yes, sir.
* * * * * *

*539 Q. We understand. Now on the way back from Alexandria to Lafayette, of course you were in the car with deputy.
A. Yes, sir.
Q. And what time did you return back to Lafayette to the motel?
A. We got back between 6:30 and 7:00, in the vicinity time.
Q. At that time you went back to your room at the hotel or did you join the other jurors?
A. No, sir. They were all waiting for us to go eat dinner, so they were all standing in Laura's room waiting for us, and I never went back to my room. I went directly back into the van.
Q. So upon your arrival to the hotel in Lafayette, you joined the other jurors. Is that correct?
A. Yes, sir. NoLaura was not there anymore. Diane and the other deputy was there. I'm lost for her name right now.
Q. And from that point forward, you continued your usual activities as a prospective juror in this case, under the supervision of deputies. Is that correct?
A. That's correct.
Q. Alright. At any time yesterday when you left Lafayette to go to Alexandria, did anyone communicate anything concerning this case to you, or did you discuss this case with anyone at all?
A. I didn't.
The following two things were clearly established: (1) Mrs. Murphy did not discuss the case with anyone at the hospital, nor did she receive any outside information regarding the case and (2) Mrs. Murphy was in the constant presence of Deputy Fogleman. Deputy Fogleman was also questioned regarding the incident. His testimony corroborated that of Mrs. Murphy.
Q. At any time, did Mrs. Murphy leave your presence?
A. No, sir.
Q. Did Mrs. Murphy discuss anything about this case or did anyone else discuss with her the "Joey" Smith case, this case that we're here about?
A. No. She was advised before we arrived at the hospital and I advised the family at the time of arrival that they couldn't discuss anything about it.
Q. Did you, Mr. Fogleman, specifically advise Mrs. Murphy that she was not to discuss this particular case, the State of Louisiana versus George Paul Smith with anyone in the hospital?
A. Yes, sir.
Q. And when did you advise her?
A. On the way there and also just after arrival, before we got out of the car.
Q. Now did you also advise family members to the effect that they were not to discuss the case with Mrs. Murphy?
A. Yes, sir.
Q. Can you tell us what family members you advised?
A. I advised her brother, sister-in-law, and her daughter specifically.
Q. Now you accompanied Mrs. Murphy up to the hospital room of her mother?
A. Yes, sir.
Q. Did you go in the hospital room with her?
A. Yes.
Q. Did you ever leave her presence while she was in the hospital room with her mother?
A. No, sir.
Q. How long did Mrs. Murphy stay with her mother in the hospital room?
A. Approximately an hour and a half.
Q. An hour and a half?
A. Yes, sir.
Q. Were you physically present in that room the whole time?
A. I was standing at thestationed at the door.
Q. And did Mrs. Murphy, during that hour and a half period, discuss this case with anyone in the room?
A. No, sir.
Q. What time did you and Mrs. Murphy leave the Cabrini Hospital?
A. Probably tenfifteen minutes after five.

*540 Q. And what time did you arrive at the hospital?
A. Around 3:30 or twenty-five to four, something like that.
Q. During your departure from the Cabrini Hospital back to Lafayette, did you remain in the presence of Mrs. Murphy at all times?
A. Yes, sir.
Q. Was there any discussion about this case?
A. No, sir. Just about her mother.
Q. What time did you arrive back at Shoney's Hotel in Lafayette, Mr. Fogleman?
A. Just a little after six o'clock.
Q. And what occurred when you arrived back at the hotel?
A. We proceeded back upstairs and everybody got ready for supper.
Q. Mrs. Murphy joined the other prospective jurors?
A. Yes, sir.
Q. And then the entire group of prospective jurors were taken to supper?
A. Yes, sir.
Following the questioning by the trial judge and the attorneys, the trial judge ruled on the written Motion for Mistrial presented by the defense regarding the sequestration violations. Regarding Mrs. Murphy, the trial judge determined that the circumstances surrounding her mother's illness and status rendered her incompetent to serve, and dismissed her from the case. Therefore, the trial judge concluded that "the motion for a mistrial become [sic] moot with respect to her because I'm satisfied that she did not communicate any facts concerning the case...."
In Smith, 322 So.2d 197 (La.1975), the court found that the trial judge, when questioning the jurors, sufficiently rebutted the presumption of prejudice caused by the brief separation of a juror which occurred after the trial court ordered the jury to be sequestered but before any evidence was taken. In the present case, the circumstances of separation proved to be such that no prejudice to the accused could have resulted. The purpose of La.Code Crim.P. art. 791 is to insulate jurors from outside communication. Brief contact with members of her family in the presence of a deputy where no mention of the case occurred cannot be considered prejudicial to the defendant. In addition, her subsequent contact with members of the venire could not be considered "outside communication" within the meaning of article 791. See State v. Liner, 397 So.2d 506 (La.1981).
Based on the substantial evidence presented, having found that Mrs. Murphy did not receive any outside communication regarding this case, we conclude that the evidence presented at the trial court's hearing on this matter indicates the presumption of prejudice created by Mrs. Murphy's separation was sufficiently rebutted. Moreover, the defense was allowed an additional peremptory challenge in light of Mrs. Murphy's dismissal. Therefore, this matter does not warrant reversal.

SEQUESTRATION VIOLATIONS INVOLVING THE ENTIRE VENIRE
The defendant also alleges that the rules of sequestration were violated when the temporary venire was permitted to watch television in the privacy of their rooms, make telephone calls, and visit with family members. The trial court questioned each individual juror about three specific things: (1) Any communication they had with Mrs. Murphy; (2) The family visits that occurred on the first two Sundays of voir dire; and (3) Whether they had watched any news programs on television that covered the case. An analysis of each of these allegations of violations proves that they have been sufficiently addressed by the trial court so as to rebut any presumption of prejudice.
Following the questioning of Mrs. Murphy regarding the circumstances surrounding her separation from the rest of the venire, and in order to ensure the absence of outside communication regarding the case, the trial judge then questioned each juror individually. First, the trial judge attempted to determine if "Mrs. Murphy communicated any facts about the case to them once she returned to the body as a whole." Each temporarily accepted juror indicated that Mrs. Murphy did not discuss the defendant's case with them upon her return. Second, each *541 juror was asked whether they had watched any news shows on television or if they had seen anything on television regarding the case. Each juror responded in the negative, adding that they had been admonished not to watch the local news. Lastly, each juror was questioned regarding whether they had discussed the case with their loved ones during the brief and supervised family visits. Each juror again responded in the negative, adding that they had been admonished not to discuss the case. Responding to the motion for a mistrial presented by the defense based on violations of sequestration, the trial judge stated:
Each one of these jurors testified that they have these t.v.'s and that they had unlimited access to all of the stations with the exception of one [juror], and she said that it was limited, which suggest [sic] to me that she limited herself. But each juror told us, and they were under oath, that they did not watch any television program that communicated any fact about the case. Like any other witness, they are presumed to tell the truth until the contrary has been established, and I believe them in that respect. Therefore, this really is not a technical violation of the sequestration rule. It's simply a violation of the potential extraneous matters coming to them. Sequestration is to keep them separated. If it is in fact a technical violation of the sequestration rule, I'm satisfied that prejudice, if any, has been overcome by their statements. Next we have the family visits. Again I'm satisfied that no extraneous communications concerning this case was brought to these jurors by their families. And to that extent the presumption of harm has also been overcome by their positive statements to the contrary. The position I take today is a little bit more realistic than the approach I think has been taken in the past in [sic] comports with the approach taken in almost every other state in the United States except Louisiana; therefore, the motion for a mistrial based on those two grounds will be denied.
In Parker, 372 So.2d 1037, a conviction was reversed based on extensive violations of sequestration involving: lack of instructions by the trial judge; lack of any supervision by court officers during sequestration; unsupervised telephone calls; access to television without supervision; and the jurors' ability to take private transportation to and from the courtroom to the hotel. This case is distinguishable from Parker in that all of the violations in that case were based on the court's lack of supervision and instruction of the jurors. The violations were particularly egregious because most took place after the trial began and evidence had been heard. Based on the totality of circumstances in that case, the court found that the procedures employed by the trial court did not properly insulate the jurors from outside communication, citing the continuing and substantial failure to adhere to sequestration mandates. Similarly, in State v. Luquette, 275 So.2d 396 (La.1973), the court set aside a conviction based on the failure of the trial judge to sequester the jurors after some of them were sworn, but before the entire jury was chosen. In that case, the state made no effort to rebut the presumption of prejudice and, therefore, the court found reversible error.
In the case sub judice, the record presents us with ample evidence regarding the trial court's admonitions to the jury and substantial questioning of the jurors individually to ensure that no prejudice was suffered by the defendant. Unlike Parker, none of the violations occurred after the trial began, nor were the jurors permitted "unsupervised" phone calls or "unsupervised" visits with their family. In addition, the jurors were repeatedly told and questioned regarding the requirements of sequestration and whether those requirements were adhered to. Having found that the presumption of prejudice was sufficiently rebutted through the meticulous questioning of the jurors by the trial judge and the attorneys, we find that the totality of the circumstances surrounding the defects of the sequestration in the case sub judice is insufficient ground to warrant a reversal. In addition, we find that the trial judge's reasoning in denying the motion for mistrial based on violations of sequestration was sound. Accordingly, this assignment of error lacks merit.

*542 ASSIGNMENT OF ERROR NUMBER 15
In his second assignment of error, the defendant contends that the state called Albert Lavalais as a witness knowing that he would refuse to testify in the presence of the jury and that, in so doing, they prejudiced the defendant by allowing the jury to draw inferences from Lavalais' refusal to testify. The defendant further claims that his right to confront and cross-examine the witness against him was denied. For the following reasons, we find that this assignment of error lacks merit.
In 1993, Albert Lavalais was convicted of first degree murder and sentenced to death for the murder of Sheila Smith. Therefore, Lavalais had no valid Fifth Amendment privilege to assert at the defendant's trial, as his guilt had already been adjudged. Indeed, Lavalais' own attorney recognized that Lavalais could not claim a Fifth Amendment privilege. In order to ensure that Lavalais would testify at Smith's trial, however, the state secured an order to compel Lavalais' testimony pursuant to La.Code Crim.P. art. 439.1, which provides:
A. In the case of any individual who has been or may be called to testify ... at any proceeding before a court of this state, or in response to any subpoena by the attorney general or district attorney, the judicial district court of the district in which the proceeding is or may be held shall issue, in accordance with Subsection B of this article, upon the request of the attorney general together with the district attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in Subsection C of this article.
B. The attorney general together with the district attorney may request an order under Subsection A of this article when in his judgment
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self incrimination.
C. The witness may not refuse to comply with the order on the basis of his privilege against self incrimination, but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.
D. Whoever refuses to comply with an order as hereinabove provided shall be adjudged in contempt of court and punished as provided by law.
The state also offered Lavalais immunity from any further prosecution which may ensue from his testimony. Therefore, even if one concludes that Lavalais continued to have a valid Fifth Amendment claim after his conviction, based on the fact that his appeal was pending, the grant of immunity would have made the claim of the privilege moot. Additionally, the trial court ordered Lavalais to testify and threatened him with contempt, at the same time recognizing the ineffectiveness of the threat on someone who has already been sentenced to death.
Despite all of the precautions taken by the attorneys and the trial court, and the fact that Lavalais had no valid privilege to assert, Lavalais persisted in his refusal to testify. Outside the presence of the jury, Lavalais was brought before the court in order to determine to what extent, if any, he would answer questions. Lavalais was assisted by counsel throughout this proceeding. In no uncertain terms, Lavalais stated that he would refuse to give any information, other than his name, in the presence of the jury, despite the fact that he would be held in contempt. The trial judge, however, correctly determined that it was necessary to put Lavalais on the stand in the presence of the jury to establish Lavalais as an "unavailable witness" and to lay the predicate for the introduction of the redacted videotape confession which had already been determined to be admissible by the supreme court. In addition, the trial judge based his determination, *543 in part, on the supreme court's holding in In re Parker, 357 So.2d 508, 512 (La.1978) (citations omitted) which states:
[T]he administration of justice supports the proposition that an individual can be compelled to give testimony incriminating himself if he is granted immunity from prosecution and punishment as a quid pro quo for compelled testimony.
Later, the following colloquy took place in open court.
[By the State]
Q. Tell us your name, please?
A. Albert Lavalais, III.
Q. Mr. Lavalais, will you answer any questions about this case if posed to you?
A. No.
Q. Alright, I'm going to ask the Court to instruct you to answer questions and I'll have a question for you after he instructs you please.
* * * * * *
[By the Court]
Q. You understand that I'm instructing you to testify?
A. I understand that.
Q. You're still refusing to?
A. Yes, sir.
The excerpt constitutes the full extent of Lavalais' exposure to the jury.
It is well-recognized in our jurisprudence that it is reversible error for the state to call a witness to testify, knowing that the witness intends to exercise his Fifth Amendment privilege before the jury. State v. Day, 400 So.2d 622 (La.1981). In State v. Berry, 324 So.2d 822, 830 (La.1975) (emphasis added), the Louisiana Supreme Court stated:
It is improper conduct for either the prosecution or the defense knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim of privilege. American Bar Association Standards of Criminal Justice, Relating to the Prosecution Function, Standard 5.7(c), and Relating to the Defense Function, Standard 7.6(c) (1971).
The defendant directs this court to consider the holding of Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), in support of his contention. In Douglas, the United States Supreme Court reversed a defendant's conviction based on the defendant's inability to cross-examine a witness who asserted his Fifth Amendment privilege before the jury. A reading of the case, however reveals that the facts of Douglas are clearly distinguishable from the facts of the case at bar. In Douglas, the witness for the state had been convicted of the same crime for which the defendant was being tried. The witness refused to answer any questions, relying on his privilege against self-incrimination. The trial court concluded that the witness was compelled to testify, as he had no valid privilege to exercise in light of his conviction. The difference between Douglas and the case sub judice is evidenced by the following actions that took place at trial.
In Douglas, after the witness asserted his privilege, the trial judge declared him a "hostile witness." The prosecutor was thereafter permitted to continue questioning the witness regarding his alleged confession, which implicated the defendant, under the guise of cross-examination. The prosecutor subsequently produced a document said to be a confession signed by the witness and proceeded to read it in open court, stopping occasionally to ask the witness, "Did you make that statement?" Each time, the witness asserted his privilege and refused to answer. The prosecutor was permitted to continue this line of questioning until the entire statement, comprising seven pages in the written record, was read before the jury. The Supreme Court held that this procedure violated the defendant's right of cross-examination. In reaching its determination, the Court cited Namet v. United States, 373 U.S. 179, 187, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963) and reaffirmed the proposition that "`inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'" Douglas, 380 U.S. at 420, 85 S.Ct. at 1077.
*544 Douglas can be distinguished from the present case on several levels. The witness in Douglas was not lawfully compelled to testify, whereas the witness in the case sub judice was granted full immunity by the court and was lawfully compelled to testify. Additionally, a redacted portion of the subsequently admitted videotaped confession in the present case was already deemed admissible, pursuant to rulings of the Louisiana Supreme Court and the Louisiana Code of Evidence. In Douglas, however, the confession was not admissible. Furthermore, the redacted portion of Lavalais' confession made no direct reference to the defendant. In Douglas, the witness' confession fully implicated the defendant as the murderer.
Douglas relied, in part, on Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), for its holding. In Namet, the Court recognized that no jurisprudence suggests that reversible error is invariably committed whenever a witness claims his privilege not to answer in the presence of the jury. The Court in Namet conducted a two-fold inquiry to determine if, in fact, reversible error had been committed in that case. First, it looked for prosecutorial misconduct, i.e. did the government make "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." Id. at 186, 83 S.Ct. at 1154-55. Second, the Court considered whether "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." Id. at 187, 83 S.Ct. at 1155.
Using the Namet analysis on the circumstances surrounding Lavalais' testimony in the case sub judice, we similarly find that no prosecutorial misconduct occurred, nor did Lavalais' refusal to testify add critical weight to the prosecution's case. First, the circumstances surrounding Lavalais' testimony were amply discussed among the various attorneys and the trial judge before Lavalais ever took the stand in the presence of the jury. In addition, Lavalais was brought to the court in order to answer questions outside of the presence of the jury. The circumstances surrounding the ultimate decision to allow Lavalais to appear in front of the jury comprise several pages in the record. Nowhere in the record, however, does it appear that the state attempted any underhanded tactics or hid its intentions from the trial court. The ultimate decision to allow Lavalais to testify was the trial judge's, based on a sound evaluation of the facts as presented. We will not impute misconduct on the part of the state when it is apparent from the record that it made its best efforts to bring all relevant information before the court, which served to allow the defense ample time for rebuttal argument. Second, and as discussed above, Lavalais did not provide any information upon which the defense could have cross-examined the witness. He simply refused to say anything at all. He was not asked questions regarding his confession, as in Douglas, nor was he asked to reveal any specific information regarding the defendant. Therefore we cannot conclude that inferences from Lavalais' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination.
In State v. Chambers, 95-898 (La.App. 4 Cir. 12/28/95); 666 So.2d 716, the fourth circuit was faced with a similar situation. In Chambers, a witness who was granted immunity from the state refused to testify. The court agreed with the trial court's finding that the witness must testify because she was granted immunity, and that, therefore, proper procedure required that the witness take the stand. The court cited Berry for the proposition that it is improper for the prosecution to call a witness it knows will claim a privilege for the purpose of impressing that fact upon the jury. However, the court stated that this was not a mechanical rule and found that, under the facts of the case, the witness' refusal to testify amounted to harmless error.
Likewise, Albert Lavalais, the witness in the present case, was granted immunity and ordered by the court to testify at trial. The witness refused to comply with the court's order, despite the threat of being held in contempt. La.Code Crim.P. art. 439.1(C) provides, in part, that a witness may not refuse to comply with an order of the court on the basis of his privilege against self-incrimination, *545 and directs that the witness must testify. More importantly, the witness in the case sub judice did not have a valid privilege to assert, thereby making his appearance in court necessary pursuant to the court order. Lastly, nothing that Lavalais said on the stand implicated the defendant's Fifth, Sixth, or Fourteenth Amendment rights.
For the foregoing reasons, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 14
In his third assignment of error, the defendant contends that the trial court erred in admitting the redacted videotaped confession of Albert Lavalais, the alleged trigger-man. The defendant objects to the admission of the tape on several grounds, namely: that it violated his right to confront and cross-examine the witness against him; that it deprived him of a fair and impartial trial; and that it deprived him of due process. For the following reasons, this assignment of error lacks merit.
La.Code Evid. art. 804 provides, in pertinent part:
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
. . . .
(2) Persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so;
. . . .
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
. . . .
(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
The commentary accompanying La.Code Evid. art. 804 provides us with additional guidance.
In criminal cases when hearsay is offered against the accused, the issue of unavailability raises constitutional concerns. A finding that the literal unavailability requirements of Paragraph A are met is not tantamount to a conclusion that the constitutional guarantees of confrontation have been satisfied. See generally Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); United States v. Inadi, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)....
. . . .
The exceptions to the hearsay rule listed in this Article are based upon the conclusion that when the qualifying circumstances are met there are usually sufficient grounds for crediting the trustworthiness of the out-of-court statement to justify making an exception to the hearsay rule.
For a statement by a declarant to be admissible under this Article ..., generally there must be sufficient indication from the circumstances that the declarant had firsthand knowledge of that of which he spoke.
In the case sub judice, Albert Lavalais was called to the witness stand by the state. Upon taking the stand, Albert Lavalais refused to answer any questions at all, although he was ordered by the court to respond to the prosecutor. According to the statutory definition, Albert Lavalais was, therefore, in fact, an "unavailable witness." As such, statements he made against his own interests could be introduced at the defendant's trial.
*546 The defendant directs this court's attention to several isolated statements Lavalais made which the defendant claims implicate someone other than Lavalais in the murder, thereby making the statements non-inculpatory and inadmissible:
Q. Did you collect money for it?
A. Yes.
* * * * * *
Q. How much did you collect for doing it?
A. I collected about $10,000.00 and the rest was supposed to have been within five years. It's supposed to have been $50,000.00 total.
* * * * * *
Q. But the original plan was for $50,000.00, right.
A. $50,000.00.
Q. Why didn't you get the rest of your money?
A. In five years, but
* * * * * *
Q. You told Cefus you killed her?
A. Huh?
Q. You told Cefus you killed her?
A. No, I never answered him on that day.
Q. Well, he asked you if you killed her?
A. He just said "You took my money, you took my job, my money," and I never said if I killed her or not. I'm sure, you know, he just assumed, you know.
In an earlier ruling on the issue of the admissibility of the statements made on the videotape, the Louisiana Supreme Court held:
The court ruled properly that Lavalais's self-inculpatory admissions in the videotaped confession constituted statements against his interest for purposes of La. C.E. art. 804(B)(3). See Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Provided that they are properly redacted to omit direct mention of relator, those statements are admissible against relator at a trial based on a coconspirator theory of liability, as tending to prove that Lavalais accomplished the objective of the conspiracy. Id. at ___, 114 S.Ct. at 2436.
State v. Smith, 94-1221, 94-1222, 94-1223, p. 1 (La.10/7/94); 643 So.2d 1221, 1221-22. In a subsequent decision, the supreme court further held:
The only portions of Lavalais' confession which are admissible as statements against interest are those statements which are self-inculpatory. All other statements in the confession are inadmissible hearsay, whether inculpatory of other persons or non-inculpatory (unless admissible on some other basis).
State v. Smith, 95-1242, p. 1 (La.6/1/95); 654 So.2d 1085. Based on this court's review of the redacted videotape, we find that the admitted statements were inculpatory in nature and did not violate the mandates of the supreme court's prior rulings on the issue by making "direct mention" of the defendant. In addition, the redacted videotaped testimony was admitted in full compliance with our rules of evidence, particularly La.Code. Evid. art. 804. Therefore, we find that this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBERS 6 AND 7
By this assignment of error, defendant contends that the state committed error warranting reversal of the conviction when "prosecutors emphasized matters that had been ruled inadmissible by the Louisiana Supreme Court and misstated evidence in a manner that confused and misled" the jury, during opening and closing statements and rebuttal arguments. Specifically, the defendant directs our attention to: Two statements, made during the state's opening argument, alleging that Lavalais was "just following orders" regarding his actions on the day of the murder and a statement that Lavalais had been "hired" to kill Sheila; and the prosecution's use of the words "redacted" and "admissible portions," in closing and rebuttal arguments, when referring to Lavalais' confession.

OPENING STATEMENT COMMENTS
The defendant alleges several specific instances of prosecutorial misconduct. First, the defendant directs us to the following excerpt from the prosecutor's opening statement:

*547 And what did Albert Lavalais do? Albert Lavalais seven years and two months later says, "I am the trigger-man. After the defendant left with his children to go to school at 7:25 in the morning I went over to the Smith residence from the nursery. I knocked on the door. Ms. Sheila came and I asked for a flashlight." Just following orders he asked for a flashlight.

(Emphasis added). At trial, the defendant objected and moved for a mistrial, pursuant to La.Code Crim.P. art. 775, which states, in pertinent part:
A mistrial may be ordered, and in a jury case the jury dismissed, when:
. . . .
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
. . . .
(5) It is physically impossible to proceed with the trial in conformity with law; ...
. . . .
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
The trial court denied defendant's motion. The defendant now asserts the same arguments that were dismissed by the trial judge in denying the defendant's motion for a mistrial in his request for a reversal.
The defendant contends that the prosecution was well aware that Lavalais never stated that he was "just following orders." Further, the defendant argues that this statement emphasized matters that were previously ruled inadmissible by the Louisiana Supreme Court. See Smith, 654 So.2d 1085; Smith, 643 So.2d 1221. The state asserts that the statement was not intended to be a direct quote. Indeed, if one reviews that portion of the record, the statement is not reflected as such. Furthermore, the state asserts that the statement referred to its theme of prosecution, i.e. that the defendant hired Albert Lavalais to kill his wife and that Lavalais was following the defendant's orders when he did so. The state insists it was only outlining what it expected to prove at trial. Based upon our thorough reading of the record, we agree that the statement was made for the purposes of indicating what the state expected the evidence to prove and that it did not use the term for the purposes of referring to the inadmissible portions of the confession.
The defendant advances the same arguments in support of his claim that the prosecutor committed reversible error in stating that Lavalais confessed to being "hired" for fifty thousand dollars. Again the defendant objected and moved for a mistrial. The trial court overruled defendant's objection and denied his subsequent motion for mistrial. The state correctly points out that an objection to the use of the word "hired" is an argument based on semantics. Although Lavalais did not say in his confession that he was "hired," he did state that he was paid by someone to kill Sheila Smith. At no time during opening statements did the prosecution remark that Lavalais confessed to being hired by, or paid by, Smith.
Because a mistrial is a drastic remedy, a strong showing of prejudice on the part of the defendant is required. State v. May, 362 So.2d 516 (La.1978). In State v. Taylor, 93-2201, p. 19 (La.2/28/96); 669 So.2d 364, 375, cert. denied, ___ U.S. ___, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) (citations omitted), the Louisiana Supreme Court stated that it would not overturn a guilty verdict because of improper argument on the part of the prosecution unless it was "`firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict.'" In the case sub judice, the prosecution's comments during opening statements were not the type which would warrant a mistrial under the provisions of La.Code Crim.P. art. 770, 771 or 775. The comments, when taken in their proper context, did not violate the wide latitude given prosecutors in opening arguments.

CLOSING STATEMENT COMMENTS
The defendant also argues it was error for the state to refer to the "redacted confession" of Albert Lavalais in its closing *548 argument. Defendant objected at trial, contending that this was a direct reference to inadmissible portions of Lavalais' confession. The defendant moved for a mistrial, which the trial court denied. The defendant thereafter objected to two other instances where the prosecution referred to the "admissible" portions of Lavalais' confession. Defendant's subsequent motions for mistrial were also denied. The defendant urges that the prejudice caused by these remarks can be seen in an interrogatory sent to the court by the jurors during deliberations in which they asked if the law prohibited them from knowing if there was any reference to the defendant's paying Lavalais ten thousand dollars on either the taped confession or the defendant's letter.
The prosecutor retains considerable latitude in making closing arguments. State v. Taylor, 669 So.2d 364, cert. denied, ___ U.S. ___, 117 S.Ct. 162, 136 L.Ed.2d 106. Before the Louisiana Supreme Court will reverse a defendant's conviction or sentence due to improper closing argument on the part of the prosecution, it must be convinced the improper remarks influenced the jury and contributed to the verdict. State v. Messer, 408 So.2d 1354 (La.1982). In reviewing the evidence presented in this case, it is clear that parts of Lavalais' confession were missing or "redacted," and that such an omission would be apparent to the jury. The prosecution did not mention the substance or content of the redacted statements, or why they were deleted. Furthermore, defense counsel is guilty of "opening the door" to the discussion of the contents of the confession by repeatedly referring to the fact that Lavalais' did not identify or name Smith as the man who had hired him to kill Sheila. Lastly, we find that the defendant did not sustain his burden of proving that the prosecution's remarks prejudiced him to the point of requiring reversal of the conviction. Even after viewing the interrogatory submitted by the jury, this court does not find the prosecution's comments influenced the jury or contributed to its verdict. Accordingly, we find that no reversible error occurred and that, therefore, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 13
The defendant contends that the letters written by the defendant and addressed to Albert Lavalais, which were admitted into evidence over defense objection, contain clear references to other crimes evidence which created unfair prejudice that substantially outweighed its probative value. Additionally, the defendant argues that the state failed to comply with the notice requirements of La. Code Evid. art. 404(B) and State v. Prieur, 277 So.2d 126 (La.1973). Lastly, the defendant asserts that the letters, as per La.Code Evid. art. 403, were prejudicial as to form, due to the manner in which they were introduced, which clearly showed that portions of the letter were omitted.
The defendant maintains that the redacted letters, as admitted, contain numerous references to other crimes; namely, kidnaping, obstruction of justice, and threats. Further, the defense argues that these other crimes, wrongs, or acts are wholly unrelated to the defendant's first degree murder charge. Specifically, the defendant points us to references regarding a "conviction," a "witness," threats to Albert Lavalais, and suggestions that Smith intended to obstruct justice by ordering that Albert Lavalais kidnap his brother so he could not testify against Smith. Finally, the defendant alerts us to the references that Paul Smith paid blackmail money to Anthony Lavalais to prevent him from talking.
In sum, the defendant argues that the redacted letters do not comply with the Louisiana Supreme Court's directive in Smith, 643 So.2d 1221. In that pretrial decision, the supreme court objected to the trial court's use of the entire letter, but recognized, however, that the letter represented Smith's own admissions which are admissible under La. Code Evid. art. 801(D)(2)(a). The supreme court directed the trial court to excise references to other crimes as to which evidence is not admissible.
The trial court complied with the supreme court's directive and redacted certain portions of the documents. On May 15, 1995, the defendant filed a writ application with this court and a simultaneous application with the Louisiana Supreme Court. The *549 writ applications encompassed several issues, including the redaction of the letters. On May 30, 1995, this court, in an unpublished writ opinion, bearing docket number 95-635 (La.App. 3 Cir. 5/16/95), held the letters written by the defendant to Albert Lavalais were properly redacted to remove inadmissible evidence of other crimes. In rendering its opinion, this court relied on the trial court's per curiam, dated April 11, 1995, which stated the following:
Generally, other crimes evidence is not admissible at the guilt phase of a capital case, unless it has independent relevance other than showing that the defendant is a man of bad character and the probative value must be weighed against its prejudicial effect. LSAC.E.art. 404; State v. Bourque, 622 So.2d 198 (La.1993); State v. Silguero, 608 So.2d 627 (La.1992). In Smith's letters he makes references to implicating Lavalais and others in a "death penalty" and "he will fry." This suggests that Smith had knowledge of a crime which was punishable by death; thus, evidence of his knowledge is relevant and admissible. LSAC.E.art. 404(B)(1). The fact that he speaks of kidnaping a witness is relevant because it tends to support his strong motive of keeping Lavalais' brother out of state, for whatever reasons, and that he is willing to use his "knowledge" to support that purpose. A limiting instruction on other crimes evidence will cure any danger of its misuse.
(Emphasis added). The Louisiana Supreme Court denied defendant's writ application as to the redaction of the letters. Smith, 654 So.2d 1085.
While we agree with the defendant's position that other crimes evidence was admitted through the redacted letter, we do not agree that the evidence was erroneously admitted nor do we agree that it unfairly prejudiced the defendant. Generally, evidence of other crimes or acts of misconduct is inadmissible. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94; State v. Silguero, 608 So.2d 627 (La.1992). La.Code Evid. art. 404(B)(1) (emphasis added) pronounces:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
However, jurisprudential exceptions have further modified this rule to allow such evidence when it tends to prove a material issue and has independent relevance, so long as it is not used for the purpose of showing the defendant is of bad character. Silguero, 608 So.2d 627; Johnson, 664 So.2d 94; State v. Kahey, 436 So.2d 475 (La.1983). One such exception to the exclusionary rule is when other crimes evidence is used to prove knowledge on the part of the defendant, when such proof is necessary to establish the guilt of the defendant. La.Code Evid. art. 404(B)(1); Silguero, 608 So.2d 627. The court recognized a similar jurisprudential exception in Kahey, finding that evidence of other crimes is admissible when the "criminal acts of the accused constitut[e] admissions by conduct intended to obstruct justice or avoid punishment for the present crime." Kahey, 436 So.2d at 488 (citation omitted). Once it is determined that the evidence is independently relevant, and for the purposes of deciding on its admissibility, the evidence must be weighed to ascertain whether it is more probative than prejudicial, pursuant to La. Code Evid. art. 403. Silguero, 608 So.2d 627; Kahey, 436 So.2d 475.
In the case sub judice, in order to advance its first degree "murder for hire" theory, one of the elements that the State had to prove was that the defendant had knowledge of his wife's murder. The defendant's statements implicating himself, Lavalais, and others in a "death penalty" case imparts direct knowledge of a crime warranting capital punishment, i.e., first degree murder, *550 and are admissible, pursuant to Silguero, as discussed above. These statements clearly constitute admissions against interest, have specific independent relevance, and were not introduced for the purposes of portraying the defendant as a man of general criminal character. See Kahey, 436 So.2d 475. The statements referring to kidnaping, obstruction of justice, and other illicit proposals provide further evidence of the defendant's attempt to avoid punishment for this crime and are also admissible pursuant to Kahey, as discussed above. In addition, these statements are admissible pursuant to La.Code Evid. art. 404(B)(1), as was asserted by the state. Furthermore, there is nothing in the letters to suggest that the defendant or Albert Lavalais did any act in furtherance of accomplishing the goals of kidnaping Anthony Lavalais and/or obstructing justice. Therefore, the mere communication of these ideas in the letters, absent any evidence of acts done in furtherance of the proposed objectives, does not, in and of itself, constitute "other crimes, wrongs or acts." Coupled with the fact that the letters never reached their intended destination, it is even less likely that any action was taken. The defense argues that the subject of the letter was the federal drug charges pending against the defendant in Lafayette. That would be a natural assumption, as the defendant was awaiting trial and jailed at the time he wrote the letters, but for the fact that the crimes for which he was charged did not carry a penalty of death. Lastly, there is nothing in the letters that suggests that the defendant was being held on federal drug charges at the time he wrote the letters, despite defendant's contentions to the contrary.
Having now, for the second time, determined that the statements contained in the redacted letters were admissible, we must once again determine whether the statements contained in the letters were more prejudicial than probative, pursuant to La.Code Evid. art. 403. First, we find that the probative value of the statements as to knowledge of the crime committed outweighed any prejudice suffered by the defendant. Second, the defendant placed the issue of knowledge before the trier of fact when he alluded to the possibility that Sheila's death resulted from a burglary that the defendant claimed to know nothing about. Third, we do not find it possible that the statements contained in the letter excited the emotions of the jury to the point of unduly prejudicing the defendant. State v. Porretto, 468 So.2d 1142 (La.1985). This is particularly true based on our finding that the redacted letters did not actually contain evidence of "other crimes, wrongs or acts," as asserted by the defendant.
The defendant correctly points out that an appellate court is not precluded from reconsidering an issue on appeal on which it has previously ruled in a pretrial matter. State v. Humphrey, 412 So.2d 507 (La.1981). However, Humphrey also stands for the proposition that great deference should be accorded to prior pretrial rulings on issues of admissibility, unless it is determined that the determination was patently erroneous and produced an unjust result. This is supported by La.Code Crim.P. art. 921 (emphasis added), which provides:
A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.

This is not the case in the matter sub judice. Based on the foregoing analysis, we find that our original ruling was well-founded and did not affect any of the substantial rights of the defendant. Accordingly, we find that this assignment of error lacks merit.
PRIEUR NOTICE REQUIREMENTS
For the first time, defendant now asserts that the state did not give the defendant notice of their intent to use these letters, in compliance with the requirements of La.Code Evid. art. 404 and State v. Prieur, 277 So.2d 126. At trial, however, the defendant did not object to the admission of the letters based on lack of notice, nor did the defendant ask for a continuance to prepare for the evidence. The state contends the defendant waived any notice requirement under La.Code Evid. art. 404(B)(1) as he did not object to the introduction of the letters in question based on insufficient notice. We *551 agree. As the court stated in Kahey, "an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." Kahey, 436 So.2d at 489. In addition, it is apparent that the defendant was well aware of the state's intention to introduce these letters into evidence as these letters were the subject of several pretrial defense writs. Furthermore, there is no evidence in the record to suggest that the defendant was surprised by the state's attempt to introduce the redacted letters. Therefore, the requirement of Prieur, regarding the notification by the state of the acts or offenses it intends to offer against the defendant with reasons, was amply met. Accordingly, this argument is meritless.
ASSIGNMENT OF ERROR NUMBER 8
In this assignment of error, the defendant asserts that the trial court abused its discretion in permitting Detective Rene Speyrer to testify as an expert witness in the field of "general criminal investigations." Specifically, the defendant contends that Speyrer's testimony impermissibly embraced an opinion regarding the guilt of the defendant, in violation of La.Code Evid. art. 704.
Scientific or professional expertise is not required in order for an individual to testify as an expert. State v. Carter, 347 So.2d 236 (La.1977). Skill and mastery of a subject derived from special training or experience is a potential area upon which expert testimony can be given. Id. The usual requirements that need to be established for a witness to qualify as an expert include: educational experience, law enforcement training, previous expert testimony, and practical experience or scientific knowledge. See State v. Lewis, 351 So.2d 1193 (La.1977); State v. McCray, 327 So.2d 408 (La.1975); State v. Nix, 327 So.2d 301 (La. 1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976). "The question of whether a witness is an expert, the scope of his expertise and breadth of his opinion are for the most part within the discretion of the trial judge. Absent an abuse of discretion, the trial judge's decision should not be overturned." State v. Brossette, 93-1036 (La. App. 3 Cir. 3/2/94); 634 So.2d 1309, 1321, writ denied, 94-0802 (La.6/24/94); 640 So.2d 1344. In the present case, Detective Speyrer had both the scientific and professional training as well as the practical experience necessary to be qualified as an expert in the field of detective criminal investigation work, as was amply established during direct examination. Accordingly, the trial court committed no error in accepting Detective Speyrer as an expert in the field of criminal investigation work.
When the state tendered St. Landry Parish Sheriff's Deputy Rene Speyrer as an expert in the field of criminal investigation work, his qualifications were explored at trial. Questions on predicate revealed that: Detective Speyrer has been a police officer for almost eighteen years; he received an associate degree in law enforcement from the University of Southwestern Louisiana, which involved courses in crime scene investigation; he has attended field training at Louisiana State University at which crime scene work was a part; he has attended numerous seminars; he is a Member of the Louisiana Association of Scientific Crime Investigators; and perhaps most importantly, he has been Chief Detective of the St. Landry Parish Sheriff's Office for ten years. Furthermore, Detective Speyrer stated that he has been on hundreds of crime scenes involving murder, robbery, and theft. The defendant objected to the trial court's acceptance of the expert witness.
During the course of the examination, and the basis for the defendant's objection, Detective Speyrer testified that, in his opinion, based on his training and experience, valuable items are not usually left behind in burglaries and thefts, as they were in the present case. La.Code Evid. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Notwithstanding, the defendant argues that the opinion testimony elicited by the state from Detective Speyrer, does not constitute *552 scientific, technical or other specialized knowledge outside that of the average juror. Therefore, the defendant insists that the detective's expert opinion should not have been admitted by the trial court, as it related to matters within a jury's knowledge and would therefore be of no aid to the jury. See State v. Bosworth, 593 So.2d 1356 (La.App. 4 Cir.), writ denied, 600 So.2d 658 (La.1992).
Not every member of the jury, however, necessarily understands how police investigators determine motives for crimes or how crime scenes are examined. The fact that the detective determined that the large amount of valuable items remaining at the scene was pertinent to the investigation stems directly from his professional technical training. In the present case, the detective's specialized knowledge was helpful to the jury. Detective Speyrer provided that he would not expect a burglar to leave behind such expensive items as guns, electronic equipment, and jewelry, and he discussed his concerns that, although some jewelry was taken from the house, expensive jewelry remained on the victim's body. Therefore, Detective Speyrer's opinion did not necessarily relate to matters within the common juror's knowledge and was within the scope afforded expert witnesses. Furthermore, although a witness may be recognized by the trial court as an expert, the trier of fact remains free to accept or reject the expert's conclusions, and the trial court so instructed the jury at the close of trial. State v. Hillman, 613 So.2d 1053 (La.App. 3 Cir.), writ denied, 617 So.2d 1181 (La.1993). Accordingly, Detective Speyrer's observations fall within the acceptable gamut of expert testimony pursuant to La.Code. Evid. art. 702, and no error was committed in allowing Detective Speyrer to testify that, in his opinion, valuable items are not usually left behind in burglaries and thefts as they were in the present case.
Additionally, because the prosecution's theme was based on a murder-for-hire scheme, the defendant argues that Detective Speyrer's testimony expressed an opinion as to the guilt of the defendant. Therefore, the defendant asserts that Detective Speyrer's testimony embraced an ultimate issue that was to be decided by the trier of fact, in violation of La.Code Evid. art. 704. An expert's opinion is not in admissible because it embraces an ultimate issue to be decided by the trier of fact. La.Code Evid. art. 704. A limitation does exist, however, in that an expert may not express an opinion as to the guilt or innocence of the accused. Id.; State v. Parker, 596 So.2d 315 (La.App. 3 Cir. 1992).
Detective Speyrer's testimony did not, however, embrace an ultimate issue to be decided by the trier of fact, in violation of La.Code Evid. art. 704, nor did he express an opinion as to the guilt of the defendant. The detective merely testified as to the evidence uncovered pursuant to his investigation and how that evidence affected the course of his investigation. Furthermore, the defendant opened the door to this line of testimony when he asserted in opening arguments that the explanation for Sheila's death involved burglary.
For the foregoing reasons, we find this assignment of error to lack merit.

ASSIGNMENT OF ERROR NUMBER 19
In this assignment of error, the defendant alleges that he was denied the right to present his defense when the trial court prohibited him from impeaching Vernon Mullens, the only state witness to testify that the defendant admitted to the murder of Sheila Smith.
Vernon Mullens, an inmate witness, was incarcerated with the defendant in the same cell block from approximately July 1993 to February 1994. At trial, Mullens related that, during a conversation which occurred in December of 1993, the defendant told him, in detail, how he had hired one of his farmhands to kill his wife. Mullens further testified in a lengthy and detailed narrative about the circumstances and details surrounding Sheila's murder, as told to him by the defendant. On cross-examination, Mullens denied that the defendant was merely discussing the theory of the state's case or that he had ever read newspaper stories related to the murder while he was imprisoned.
In order to impeach Mullens, the defense called Charlie Shannon, another inmate witness, who was the defendant's cell mate from *553 July 1993 to February 1994. Shannon was present during the December 1993 conversation in which Mullens claimed the defendant admitted to the killing. Contrary to what was said by Mullens, Shannon testified that the conversation related solely to the state's theory of the case, and was not about what the defendant claimed to have done. Furthermore, Shannon testified that there were numerous newspaper articles circulated among the inmates at the prison regarding Sheila's murder. Defense counsel then attempted to elicit from Shannon the specific statements made during the conversation for the purposes of attacking the credibility of Mullens' testimony and pursuant to La.Code Evid. art 607 and 613. Although the defense succeeded in laying a foundation for the impeachment of Mullens, the trial court refused, on hearsay grounds, to allow Shannon to testify about what the defendant said during the conversationi.e. whether the defendant, in fact, ever stated that he murdered his wife. The defense strenuously objected to the ruling, citing La.Code Evid. art. 607 and 613, Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) and State v. Gremillion, 542 So.2d 1074 (La. 1989).
La.Code Evid. art. 607 provides that a defendant may attack the credibility of a witness through the use of extrinsic evidence which contradicts the witness' testimony, provided that a proper foundation is laid for such extrinsic evidence pursuant to La.Code Evid. art. 613. La.Code Evid. art. 613 states that extrinsic evidence is admissible if the defense has fairly directed the witness' attention to the statements, and the witness has been given the opportunity to admit the fact and failed to do so. In the present case, the trial judge recognized that the defense had laid the proper foundation for the admission of extrinsic evidence in order to rebut Mullens' statements. Furthermore, a reading of the record confirms that the defendant was given an opportunity to attack the credibility of Mullens. In fact, the defense successfully impeached Mullens on at least two occasions. First, Shannon testified that the December conversation involved a discussion of the state's theory of the case. Shannon's statement, therefore, directly contradicted Mullens' denial of that statement made earlier during his cross-examination. Second, Shannon testified that there were several news stories circulating the prison regarding the details of the murder. This statement was in direct contradiction of Mullens claim that there were no news stories. Therefore, it is clear that the defense was given ample opportunity to attack the credibility of Mullens.
The defense claims, however, that it was denied the opportunity to use extrinsic evidence, permitted by La.Code Evid. art. 607, because they were not allowed to introduce, through Shannon's testimony, specific statements made by the defendant. The defense wanted to use the defendant's own statements, as recalled by Shannon, in order to contradict the claims made by Mullens that the defendant admitted to killing his wife. Although, the defense articulated an apparently valid reason for wanting to use the evidence, namely, use of the statement for impeachment purposes pursuant to La. Code Evid. art. 607(D)(2), such evidence is admissible only "when offered solely to attack the credibility of the witness." Id. (Emphasis added). A statement by the defendant that he is not guilty of the crime charged could not be admitted solely to attack the credibility of a witness in the case sub judice, as the defendant claimed innocence throughout the trial.
Furthermore, such statements do not overcome the fact that a defendant's non-admission of guilt will generally be considered as being offered for the truth of the matter asserted. Although such statements are considered extrinsic evidence under art. 607, in order to be admissible at trial, the extrinsic evidence cannot violate well-grounded hearsay rules. According to La.Code Evid. art. 801, "hearsay" is an out of court statement, constituting either a written, verbal or non-verbal action, made by someone other than the present witness, offered at trial to prove the truth of the matter asserted. Thus, asking Shannon to testify as to the defendant not admitting to the murder of his wife would clearly violate the hearsay rule. Although the defendant claimed he was not introducing the statements for the truth of the matter asserted, we cannot ignore that it would be *554 one of the primary reasons for the introduction of the statement, particularly in a case where the defendant claims his innocence, as discussed above.
As the defense points out, Mullens was permitted to testify regarding the defendant's statement that he had hired someone to kill his wife. However, that statement is non-hearsay pursuant to La.Code Evid. Art. 801(D)(2)(a), which states that a statement made by a defendant which is offered at trial against the defendant is admissible. The statement the defense was attempting to elicit from Shannon, i.e. that the defendant never said he paid someone to kill his wife or that the defendant never said he killed his wife, would not be offered against the defendant. Therefore, such statements are inadmissible hearsay statements.
The defendant directs this court's attention to Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), wherein the United States Supreme Court stated that:
Few rights are more fundamental than that of an accused to present witnesses in his own defense..... [W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.
We are well aware that a defendant has a constitutional right to present a defense. U.S. Const. amend. VI; La. Const. art. I, § 16. "While hearsay should generally be excluded, if it is reliable and trustworthy and its exclusion would interfere with the defendant's constitutional right to present a defense, it should be admitted." State v. Gremillion, 542 So.2d at 1078; see also State v. Van Winkle, 94-947, p. 5 (La.6/30/95); 658 So.2d 198, 202 ("Evidentiary rules may not supersede the fundamental right to present a defense."); State v. Hill, 610 So.2d 1080, 1086 (La.App. 3 Cir.1992) ("Constitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence, only that which is deemed trustworthy and has probative value.")
In Gremillion, the Louisiana Supreme Court reversed a defendant's conviction based on the trial court's error of not allowing the admission of a hearsay statement that did not fit any of the recognized exceptions to the hearsay rule. The court ruled that the statement should have been admitted due to its reliability and trustworthy nature. The hearsay statement at issue in Gremillion, however, is drastically different from the statements offered by the defendant in the case sub judice. In Gremillion, the defendant had been convicted of manslaughter for the murder of his friend. The facts established that during the early morning hours of February 7, 1987, the defendant and the friend had engaged in an argument at a local bar. As a result of the argument, the defendant threw the victim on a table, and while he lay on the ground unconscious, the defendant proceeded to kick him in the chest. When the victim regained consciousness, he left the bar. Approximately 8 hours later, the victim checked himself into a hospital complaining of pain. While at the hospital, the victim gave statements to both the police and the treating physician regarding his attack. The victim died on February 25, 1987 as a result of his injuries.
The defense attempted to subsequently introduce the statements made by the victim to the police officer and the doctor. The statements made to the officer indicated that the victim had been attacked by "three white males." The victim told the physician that he had been attacked by "several others." At no time during his treatment or his conversation with the police officer did the victim identify his longtime friend, the defendant, as his attacker. Coupled with the fact that the victim's whereabouts could not be verified for 8 hours following the altercation with the defendant, the supreme court found, that while the statements did not fit into any hearsay exceptions, they should have been admitted because of their reliability and trustworthiness.
The statements offered by the defendant in the matter sub judice, however, cannot be qualified as equally reliable and trustworthy. The defense never attempted to establish the trustworthiness or reliability of these statements. In addition, on cross-examination, it was established that Shannon and the defendant remained close friends even after their *555 separation. Even if the defendant did attempt to establish the trustworthiness of the statements, the claims could be easily rebutted by Shannon and the defendant's relationship. Furthermore, the defendant was not prevented from presenting his defense. The defendant claimed that he was offering Shannon's statements in order to impeach Mullens. Yet the record reflects that the defense successfully impeached Mullens on at least two occasions. Therefore, the defendant was not prevented from accomplishing his stated goal, nor was his constitutional right to present a defense interfered with, despite the rulings on the inadmissibility of these statements.
For the foregoing reasons, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 20
In this assignment of error, the defendant contends that his jury was irreparably tainted after state witness, Vernon Mullens, made the following statement during direct examination: "Mr. Smith has a hit on me right now." Therefore, the defendant claims that a fair trial could not be conducted in light of the jury's exposure to such statement.
During the state's questioning of Vernon Mullens, the following colloquy occurred:
Q. Alright, don't tell us why but in the confines of a prison is it dangerous for inmates to testify against other inmates?
A. Yes, it is.
Q. Does the word get around pretty quickly?
MR. SMALL: Your honor, I would object to this being irrelevant to this case.
THE COURT: The objection is overruled.
A. Yes, and I have proof of it too.
Q. Were you concerned and are your concerned about your safety?
A. Yes, I am.
Q. Is that the only thing you've asked the authorities to make sure that you get is safe treatment?
A. True.
Q. Alright. Has anybody promised you any kind of sentence reduction or help on your criminal charges in connection with the information you've provided in this case?
A. No, sir. Mr. Smith has a hit on me right now.
MR. SMALL: Your Honor
Q. Don't
THE COURT: Don't
MR. SMALL: Your Honor, I object....
Based on the state's murder-for-hire theory of the case, the defendant requested a mistrial due to the prejudicial nature of the statement, but never suggested that the prosecutor instructed the witness to make such statement. Based on La.Code Crim.P. art. 770 and 775, the defense declared that a mistrial was in order due to the statement's reference to other inadmissible crimes, that it was a comment elicited by a court official, and because the remark was made intentionally by the witness. The trial court denied the defendant's request for a mistrial. The defense asked that the judge not admonish the jury so as not to call attention to the statement. The trial judge honored the defendant's request.
La.Code Crim.P. art. 770 states, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
. . . .
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible[.]
(Emphasis added). After a defendant moves for a mistrial on the basis of a remark prohibited by La.Code Crim.P. art. 770, there is a per se violation of the defendant's rights if the trial court denies the motion. State v. Lee, 569 So.2d 1038 (La.App. 3 Cir.1990). "The court of appeal is not free to speculate what the jury might have found had the defendant's rights not been violated." Id. at 1043. Pursuant to the language of the statute, however, this article does not control a determination regarding a mistrial in the *556 case of a statement made by a witness. Therefore, because the remark in the present case was made by a witness, article 770 is inapplicable. State v. Morgan, 454 So.2d 364 (La.App. 4 Cir.1984).
In State v. Madison, 345 So.2d 485 (La. 1977), the court held that when an impermissible reference to another crime is deliberately elicited of a witness by a prosecutor, the error is imputable to the state and mandates a mistrial. However, the defense attorney in the present case did not suggest that the prosecutor purposefully elicited these remarks from the witness, nor does the record indicate that the nonresponsive answer was deliberately elicited by the state. The last question asked of the witness merely sought to establish whether the witness had been promised any kind of sentence reduction or help with his criminal charges in return for his testimony. As the court stated in State v. Newman, 283 So.2d 756, 758 (La. 1973), the "unsolicited statements and spontaneous conduct of a witness are not usually grounds for a mistrial." Furthermore, where prohibited testimony is voluntary and unresponsive to the prosecutor's questions, there is no indication of bad faith on the part of the state. State v. Cook, 590 So.2d 720 (La.App. 3 Cir.1991).
The other mistrial statute referred to by the defense is La.Code Crim.P. art. 775, which states, in pertinent part:
A mistrial may be ordered, and in a jury case the jury dismissed, when:
. . . .
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
. . . .
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
The defendant further directs this court's attention to State v. Prudholm, 446 So.2d 729 (La.1984), wherein the court held that a trial court may grant a motion for mistrial if a witness's remark on the stand is so prejudicial that an admonishment under La.Code Crim.P. art. 771 is insufficient to assure the defendant a fair trial. However, in State v. Lewis, 95-0412, p. 4 (La.App. 4 Cir. 9/28/95); 662 So.2d 77, 79, writ denied, 95-2625 (La.2/2/96); 666 So.2d 1088, the court held:
The trial court has discretion to determine whether a fair trial is impossible, or whether an admonition is adequate to assure a fair trial when the alleged misconduct does not fit into the provisions for mandatory mistrial, and the ruling will not be disturbed on review absent an abuse of discretion. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).
In Morgan, the court held that an admonition can cure any prejudice resulting from voluntary and unresponsive remarks made by witnesses when these questions do not indicate bad faith on the part of the state. Although the trial court offered to admonish the jury, the defendant, as part of his trial strategy, refused the admonition so as not to emphasize the error to the jury. It is our contention that an admonition by the trial judge to the jury could have cured any prejudice suffered by the defendant regarding Mullens' statement. Because no admonition was requested by the defense, the assignment of error is without merit. Morgan, 454 So.2d 364.
In addition, counsel argues that the prejudice was compounded because the prosecution referred to Mullens' testimony in closing arguments. However, our careful review of the record does not provide any instances where the prosecutor referred to Mullens' statement regarding "the hit."
It is well-established in our system of jurisprudence that a mistrial is a drastic remedy which should be declared only in situations where substantial prejudice to the defendant may result. State v. Smith, 430 So.2d 31 (La.1983); Brossette, 634 So.2d 1309; State v. McFerson, 583 So.2d 516 (La.App. 3 Cir.1991), writ denied, 588 So.2d 113 (La.1991). Furthermore, the trial court has great discretion in determining whether to grant a mistrial, and absent abuse of discretion, the trial court's ruling *557 will not be disturbed. Smith, 430 So.2d 31; Brossette, 634 So.2d 1309; McFerson, 583 So.2d 516. Lastly, the defense has not presented us with a statute which, under the circumstances surrounding Mullens' statement, would require a mandatory mistrial to be ordered by the trial court. According to La.Code Crim.P. art 775, the defendant has failed to point out the legal defect in the proceedings which would make the judgment entered upon the jury's verdict reversible as a matter of law. Absent a statute directing such mandatory reversal, a decision on whether to grant a mistrial is left to the trial judge's vast discretion. Having found Mullens' comment to have been unresponsive and unsolicited, and finding no abuse of discretion on the part of the trial judge, we find this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBERS 3 AND 4
In this assignment of error, the defendant contends that he was deprived of his constitutional and statutory rights to voir dire, along with the right to exercise twelve peremptory challenges, due to the trial court's failure to excuse jurors Eileen Suarez and William Bertrand for cause. The defendant asserts different reasons as to why Suarez and Bertrand should have been excused for cause and thus prevented from serving on the panel. Therefore, this court will consider separately the assignment of error as to each venire person in order to facilitate a clear and unambiguous determination.

EILEEN SUAREZ
Defendant contends that Ms. Suarez should have been excused for cause for her apparent inability to consider "intoxication" as a mitigating factor during penalty phase proceedings in a capital case. This issue could be considered moot as the death penalty was not imposed nor was a theory of "intoxication" advanced by the defense at any point throughout the trial. However, in the interest of justice, we accept this assignment of error for review. In addition, the defendant contends that the trial court addressed him in a derogatory fashion during Ms. Suarez's voir dire examination, thereby compounding the need to excuse Suarez for cause. After a careful review of the record, we find that the assignment of error as to venire person Suarez lacks merit.
Both the federal and state constitutions provide a criminal defendant the right to be tried by an impartial jury of his peers. U.S. Const. amend. VI; La. Const. art. I, § 16. In addition, La.Code Crim.P. art. 797 provides, in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
. . . .
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
. . . .
(4) The juror will not accept the law as given to him by the court....
When a defendant uses all of his peremptory challengestwelve in a capital casea trial court's ruling that erroneously denies a defendant's challenge for cause deprives said defendant of his constitutional and statutory rights, and therefore, requires reversal. State v. Maxie, 93-2158 (La.4/10/95); 653 So.2d 526. In State v. Cross, 93-1189 (La.6/30/95); 658 So.2d 683, 686, the court discussed the defendant's burden of proof regarding claims of reversible error for denials of challenges:
Prejudice is presumed when a challenge for cause is erroneously denied by the trial court and the defendant has exhausted all of his peremptory challenges. To prove there has been reversible error warranting reversal of the conviction and sentence, defendant need only show (1) the erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges.
In the present case, defendant had not exhausted all of his peremptory challenges. If a defendant has not used all of his peremptory challenges, however, he still possesses the right to demonstrate prejudice from the trial court's error, if he lodges an objection at trial pursuant to La.Code Crim.P. art. 800. State *558 v. Robertson, 92-2660 (La.1/14/94); 630 So.2d 1278.
In his attempt to prove prejudice, the defendant directs us to the portion of the record where defense counsel questioned Suarez concerning her willingness to consider statutory mitigating circumstances during the penalty phase of a death penalty case. In response to counsel's questioning, Ms. Suarez indicated that she would not consider "intoxication" as a mitigating factor in a capital sentencing proceeding. After extensive questioning by both the defense and the state, and in the continued presence of Ms. Suarez, the following colloquy ensued:
Q. [By Mr. Small]: Suppose in this particular case, that particular scenario developed where it was shown that the defendant had consumed enough alcohol to prevent that individual from understanding the criminality of his conduct, would you consider that fact in determining whether you should impose the death penalty or life imprisonment?
A. [By Suarez]: Oh, sure.
THE COURT: I believe you can. Thank you.
MR. SMALL: Your Honor, I want to
THE COURT: Denied. I'll let you argue it but the questioning on this prospective juror has just ended.
MR. SMALL: That's not what I was rising to address the Court on.
THE COURT: Uh hum?
MR. SMALL: I was wondering if we could be heard outside the presence of this particular
THE COURT: After you pass on her, you can be heard.
MR. SMALL: I would like to be allowed to make an objection before passing because I think that after that it's too late for my legal purposes. If I could have the Court
THE COURT: Okay, take this lady out for a second.
(Mrs. Suarez is excused from the courtroom.)
THE COURT: Let the record show the prospective juror has been removed from the courtroom.
MR. SMALL: Yes, sir. In response to an objection that I made and remarks I was making to this Court, the Court raised its voice to me and screamed at me in a manner which I feel was absolutely unwarranted. I have asked questions and I'm going to continue to ask questions that I feel appropriate regardless how they're viewed by the prosecution and frankly regardless how they're viewed by the Court. I have attempted to conduct myself and intend to continue to do so respectfully towards your Honor. I am obligated, in a case where the State is trying to kill my client, to ask questions. I frankly do not feel that I deserve the treatment I just got from this Court. I think it is unfair to me in the presence of a prospective juror in a death penalty case to in effect dress me down as I was just dressed down. I have made every effort to conduct myself professionally and I will in the future. I will not be intimidated out of representing Paul Smith.
THE COURT: I don't want you to be intimidated.
MR. SMALL: Oh, I'm not going to be. I was treated unfairly in front of that juror. I want to move to excuse this juror for cause. My questions were clear as a bell to this juror regarding her ability to follow the law on mitigating circumstances. I made every effort to explain the second phase of the trial. As you have indicated in the past you thought we put to jurors in a confusing way. If it can be put clearer, I am not capable of doing so. I have tried every way I know to comply with every observation this Court has made. I amI'm moving that this juror be excused for cause not only because of her obvious inability to consider drinking as mitigating except if someone force feeds two fifths of Jack Daniels down their throat which is frankly a disingenuous hypothet, but not only that, Judge, because of the way in which I was addressed as an officer of this court in front of that juror. I have never tried to show disrespect to your Honor, never once.

*559 THE COURT: I agree.
MR. SMALL: But I am an officer of this court too and I am entitled to respect if I am respectfully doing my job. And I have never attempted to do anything else. And I don't know what I did to offend you, but I don't think I had that coming.
THE COURT: If I've offended you, I apologize. Your challenge for cause is denied.
A trial judge is vested with wide discretion in ruling on a challenge for cause, and his ruling should not be disturbed on appeal unless a review of the entire voir dire reveals the trial judge abused his discretion. Cross, 658 So.2d 683. In the present case, a thorough reading of the record indicates that the trial judge, after further inquiry and instructions, as delineated above, rehabilitated juror Suarez and established her ability to decide the case impartially according to the law and evidence.
A trial court commits no error in refusing to dismiss a juror who expresses some reservation about accepting the law if, after further questioning, the juror assures the trial court he could apply the law as given and give the defendant a fair trial. State v. Ellwest Stereo Theatres, Inc., 412 So.2d 594 (La.1982). As such, no error was committed on the part of the trial court in the present case in refusing to dismiss juror Suarez for expressing some reservation about accepting the law. Ms. Suarez clearly indicated that she could apply the applicable law and give the defendant a fair trial after additional questioning by the trial court. See, e.g. State v. Munzy, 464 So.2d 1040 (La.App. 1 Cir.), writ denied, 468 So.2d 1203 (La.1985) (appellate court held no error was committed when the trial court refused to dismiss a juror who expressed some reservation about accepting the law, when, after additional questioning by the trial court and the state, the juror assures the trial court he could apply the applicable law and give defendant a fair trial).
Finally, in examining the trial judge's comments to defense counsel, we find that, although counsel may have been cut-off by the court, there is no evidence that this occurrence influenced the jury or contributed to their verdict. See State v. Johnson, 604 So.2d 685 (La.App. 1 Cir.1992), writ denied, 610 So.2d 795 (La.1993). Further, there is no evidence to indicate that the trial court was attempting to impress upon the jurors an opinion as to the defendant's guilt or innocence. See State v. Glynn, 94-0332 (La. App. 1 Cir. 4/7/95); 653 So.2d 1288, writ denied, 95-1153 (La.10/6/95); 661 So.2d 464. The trial court's remarks were not of a nature that would tend to prejudice the defendant, nor does the record indicate defense counsel requested an admonition in accordance with La.Code Crim.P. art. 771. In addition, the trial judge gave the following instruction at trial:
If I have given you the impression that I have an opinion regarding any fact in this case, you are to disregard that impression. And if I've given you the impression that I have an opinion concerning the guilt or innocence of the defendant you are to disregard that impression.
Accordingly, we find that Ms. Suarez was sufficiently rehabilitated and that the trial court did not commit reversible error in refusing to grant defendant's challenge for cause.

WILLIAM BERTRAND
Defendant also contends that the trial court erred in denying his challenge for cause as to prospective juror, William Bertrand. During voir dire, Mr. Bertrand related a conversation that he had with a fellow employee. Mr. Bertrand indicated that he was told by a co-worker that the defendant had killed a former wife and his present wife. Mr. Bertrand indicated that he did not give the comment much consideration, as the co-worker is unreliable.
The defendant contends that Mr. Bertrand should have been excluded for cause, citing State v. Goodson, 412 So.2d 1077, 1081 (La. 1982), appeal after remand, 437 So.2d 1174 (La.App. 2 Cir.1983), which states:
A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory *560 material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind.
In State v. Lee, 559 So.2d 1310, 1318 (La. 1990) cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (citations omitted), however, the Louisiana Supreme Court held:
When a juror expresses a predisposition as to the outcome of a trial, a challenge for cause should be granted. Yet, if after subsequent questioning the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. When assessing whether a challenge for cause should be granted, the trial judge must look at the juror's responses during her entire testimony, not just "correct," isolated answers; or, for that matter, "incorrect", isolated answers.
Although the reference to the defendant's killing of a second wife was highly significant and incriminating, inadmissible information, the record clearly reflects that juror Bertrand was sufficiently rehabilitated by the trial court. In fact, Mr. Bertrand told the court he took the co-worker's statements with a grain of salt. Mr. Bertrand further added that the comments would not enter into his determinations of guilt or innocence of the defendant or affect any other decision he may be required to make in this case. In addition, Mr. Bertrand stated that he could decide the case strictly on the evidence presented to him in the courtroom.
The defendant also alerts us to the statement made by Mr. Bertrand indicating that he was unwilling to consider "alcohol as an excuse, in determining the penalty to be imposed," or to consider a defendant's lack of prior criminal activity as a mitigating circumstance for not imposing the death penalty, in accordance with La.Code Crim.P. art 905.5(a). After additional inquiry by the trial court, Mr. Bertrand stated he would consider intoxication as a mitigating circumstance for not imposing the death penalty. Mr. Bertrand further stated that if the law required him to consider the lack of a prior criminal record as a mitigating circumstance, he would consider it. As discussed above, a trial judge is vested with wide discretion in ruling on a challenge for cause, his ruling should not be disturbed on appeal absent an abuse of discretion. Cross, 658 So.2d 683. Consequently, we find that Mr. Bertrand was fully rehabilitated by the trial court concerning both issues.
For the foregoing reasons, this court concludes that this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 21
The defendant contends that the trial court committed reversible error when it refused to give requested jury instructions that were pertinent, wholly correct, and needed no explanation. The defendant argues that these instructions met the requisite criteria of La. Code Crim.P. art. 807 and were necessary to prevent the state from being relieved of its burden of proof in this case.
La.Code Crim.P. art. 807 governs the submission of special written charges to the jury. The article provides:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
Louisiana jurisprudence has consistently held that requested charges which are already substantially given and covered by the court's general charge are properly refused by a trial court. State v. Smith, 414 So.2d 1237 (La.1982). In addition, in State v. Wright, 593 So.2d 759, 766 (La.App. 5 Cir.), writ denied, 599 So.2d 313 (La.1992), cert. denied, 506 U.S. 922, 113 S.Ct. 340, 121 L.Ed.2d 257 (1992), the court held that, "[F]ailure to read a special charge constitutes reversible error only when there is a *561 miscarriage of justice, prejudice to the substantial rights of the accused or a violation of a constitutional or statutory right." In State v. West, 568 So.2d 1019, 1023 (La.1990), the court outlined the standard for evaluating jury instructions, as follows:
The test articulated is whether, taking the instruction as a whole, reasonable persons of ordinary intelligence would understand the charge.
The defendant first directs us to the jury charge on specific intent. The defendant requested the following charge on the subject:

Requested Jury Instruction No. 3
Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Proof of one person's intent is not proof of another's intent.
La.R.S. 14:10(1).
State v. Holmes, 388 So.2d 722 (La.1980).
In response to defendant's requested jury instruction regarding specific intent, the trial judge responded:
THE COURT: With respect to the requested special charge number three, specific intent, the charge given by the State is that taken from the statute. The subject of proof of one person's intent is not proof of another's person's intent which requires some explanation; consequently, I'm not going to give it.
The defendant also requested a special instruction regarding the law of principals, which read as follows:
Requested Jury Instruction No. 6
George Paul Smith may only be convicted as a principal for the crime of first degree murder if you find that the State has proven beyond a reasonable doubt that George Paul Smith personally had the specific intent to kill Sheila Smith. It is not enough to find merely that an accomplice had the specific intent to kill Sheila Smith, since this intent cannot be imputed to Paul Smith.

State v. Holmes, 388 So.2d at 726 (La. 1980).

State v. Brooks, 505 So.2d 714 (La.1987).

State v. West, 568 So.2d 1019 (La.1990).
In response to requested jury instruction number six, the trial judge responded:
THE COURT: With respect to number six, I do have a charge in the general charge that the defendant must have entertained a specific intent to kill or inflict great bodily harm. The remainder of this charge is mostly argument; consequently, I reject it.
In its general charge to the jury, the trial court included an instruction on specific intent in a first degree murder case and the law of principals. The trial court specifically stated:
Now first degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm and offered or gave anything of value for the commission of the offense.
Thus, in order to convict the defendant of first degree murder, you must find beyond a reasonable doubt that he had an intent to kill or inflict great bodily harm, and he offered or gave anything of value for the commission of the crime.

. . . .
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission or directly or indirectly counsel or procure another to commit the crime, are principals.
(Emphasis added).
Our review of the record indicates that the jury was properly instructed on specific intent in the context of the first degree murder statute. In addition, the combined instructions on specific intent and the law of principals clearly stated that, in order to find the defendant guilty, the jury must find that he, the defendant, had a specific intent to kill. Thus, there was no error on the part of the trial court in refusing to give the requested jury instructions, as they were sufficiently included in the general charge given by the *562 trial court. As noted by the state in brief, there was no ambiguity on this issue and no suggestion that the specific intent of the accomplice could be imputed to the defendant.
The defendant directs this court's attention to West, wherein the Louisiana Supreme Court vacated a defendant's conviction and sentence due to the trial judge's failure to instruct the jury that the defendant, personally, had to have the specific intent to kill to be found guilty of first degree murder. The court noted that the charge given to the jury on the law of principals could have led a reasonable person to conclude that he could imply specific intent from the mere fact that the defendant knew of his co-perpetrator's intent. The trial court compounded the problem when, in reciting an instruction on principals, it stated that "`equal offenders [] are subject to the same punishment.'" West, 568 So.2d at 1024.
The charge in the present case, however, is more akin to the charge given in State v. Holmes, 388 So.2d 722 (La.1980). That court reiterated that it is not enough to find the defendant's accomplice had the necessary mental state. "It must be shown that this accused also had the specific intent to kill." Id. at 726. The trial court, in the case sub judice, specifically stated that "in order to convict the defendant of first degree murder, you must find beyond a reasonable doubt that he had an intent to kill or inflict great bodily harm...." Thus, the jurors were sufficiently informed of the requirement that they must find specific intent on the part of the defendant in order to convict him of first degree murder.
The defendant next argues the trial court erred in not giving Requested Jury Instruction No. 5, which stated:
George Paul Smith may only be convicted for the crime of first degree murder if you find that the State has proven beyond a reasonable doubt that George Paul Smith offered or gave anything of value to Albert Lavalais and that Albert Lavalais killed Sheila Smith. It is not enough to find merely that Mr. Smith offered or gave anything of value to Cephus Lacart, Harold Bearb, or Matthew Leary, or any other person, who did not kill Sheila Smith.
La.R.S. 14:2(2).

State v. Holmes, 502 So.2d 1112 (La.App. 4 Cir.1987).
The trial court refused to give this requested charge, finding it contained argument and was sufficiently covered in the general charge. As noted above, the trial court stated in its general charge that: "[I]n order to convict the defendant of first degree murder, you must find beyond a reasonable doubt that he had an intent to kill or inflict great bodily harm, and he offered or gave anything of value for the commission of the crime." Therefore, we find the trial court committed no error in refusing to give Requested Jury Instruction No. 5, as it was merely repetitious of the general charge given by the trial court and could be misleading. Additionally, the requested jury instruction as written would insulate the defendant from any culpability if he paid a party to murder his wife who subsequently paid a third party to actually commit the murder. Such an instruction would be contrary to the law of principals.
Lastly, the defendant also claims Requested Jury Instruction No. 4 should have been read to the jury. This requested charge stated:
If you believe that any witness in the case, either for the State or the defense, has willfully and deliberately testified falsely to any material fact for the purpose of deceiving you, then I charge you that you are justified in disregarding the entire testimony of such witness as proving nothing and unworthy of belief. You have the right to accept as true, or reject as false, the testimony of any witness accordingly as you are impressed with his or her veracity.

State v. Prestridge, 399 So.2d 564 (La. 1981).
The trial court gave the following reasons for rejecting the requested instruction:
THE COURT: Okay, let's see, requested jury instruction number four, the old falsus in uno, falsus in omnibus charge, I do not give it. I reject it as being an unworkable charge. This has to be one *563 that has to be given with a great deal of caution and since I think lay jurors are not capable of handling it, I do not give it. It's rejected.
The defendant notes that a similar charge was approved in State v. Prestridge, 399 So.2d 564 (La.1981). The court in Prestridge noted that such a charge is "a fair statement of the jury's function as trier of fact and judge of credibility." Id. at 578. The state argues that although the instruction was approved in Prestridge, the court's decision does not require the instruction be given here. We agree. In addition, our review of the record reveals that the trial court gave adequate instructions concerning the evaluation of the credibility of the witnesses' testimony in its general charge to the jury.
As jurors, you alone shall determine the weight and credibility of the evidence. As the sole judges of the credibility of the witnesses and of the weight their testimony deserves, you should scrutinize carefully the testimony given and the circumstances under which the witnesses testified. In evaluating the testimony of a witness you may consider his or her ability and opportunity to observe and remember the matter about which he or she testified, his or her manner while testifying, any reason he or she may have for testifying in favor of or against the State or the defendant, and the extent to which the testimony is supported or contradicted by other evidence.
The testimony of a witness may be discredited by showing that the witness will benefit in some way by the defendant's conviction or acquittal, that the witness is prejudiced, or that the witness has any other reason or motive for not telling the truth.
The testimony of a witness may also be discredited by showing that the witness made a prior statement which contradicts or is inconsistent with his present testimony. Now such prior statements are admitted only to attempt to discredit the witnessnot to show that the statements are true.
The testimony of a witness may be discredited by showing that the witness previously was convicted of a crime. The conviction does not necessarily mean that the witness is failing to tell the truth. It's a circumstance you may consider along with all other evidence in deciding whether you're going to believe the testimony of the witness.
Accordingly, the defendant's requested charge would have been repetitive and confusing.
We find that the trial judge committed no error in refusing to give the requested charges as they were substantially given and were covered by the court's general instructions to the jury. Furthermore, we find that the trial court did not commit a miscarriage of justice, prejudice the substantial rights of the accused, or violate the defendant's constitutional or statutory rights. Reading all of the instructions in their entirety, we do not find that reasonable persons of ordinary intelligence would have misunderstood the charges as given by the trial judge.
For the foregoing reasons, this assignment of error lacks merit.

CONCLUSION
Defendant's conviction and sentence are affirmed and this case is remanded to the trial court to amend the commitment and minute entry of the sentence to reflect that the defendant is given credit for time served. Moore, 640 So.2d 561. The district court should inform the defendant of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and file written proof that the defendant received the notice in the record of the proceedings.
AFFIRMED AND REMANDED WITH INSTRUCTIONS.